**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| GABRIEL SANCHEZ, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. 5:18-cv-00184 |
| | § | |
| | § | |
| CITY OF SAN ANTONIO BY AND | § | |
| THROUGH ITS AGENT, CITY PUBLIC | § | |
| SERVICE BOARD OF SAN ANTONIO | § | |
| | § | |
| Defendant, | § | |

---

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

Plaintiff, **GABRIEL SANCHEZ** ("Mr. Sanchez" or "Plaintiff") files this Response in Opposition to Defendant **CPS ENERGY'S** ("CPS" or "Defendant") Motion for Summary Judgment (the "Motion") [D.E. 39] and respectfully shows as follows:

## I.    INTRODUCTION

1.    Plaintiff, Gabriel Sanchez, was terminated on March 8, 2016 from his position as Journeyman Cable Splicer at CPS Energy while on a medical leave of absence and after CPS learned that he had Post Traumatic Stress Disorder ("PTSD"). Mr. Sanchez's termination followed an exemplary 16-year career at CPS, with multiple promotions to become a Journeyman Cable Splicer. In 2015, he reported to his supervisor, Richard Lujan, having fears in performing certain aspects of his job as a result of an on-the-job accident ("flash" incident) that occurred in March of 2014. Richard Lujan told Sanchez that he believed Sanchez had PTSD.

Subsequently, Mr. Sanchez was involved in a second "flash" incident on September 21, 2015 that hospitalized him. Mr. Sanchez was formally diagnosed with PTSD later that day at the hospital. On the evening of September 21, 2015, it is undisputed that Mr. Sanchez informed Richard Lujan, when he visited Sanchez at the hospital, that he had received a PTSD diagnosis. Thereafter, Mr. Sanchez would never work for CPS Energy again, as he was out on a medical leave of absence from September 21, 2015 until March 8, 2016, the date of his termination.

2.      CPS has failed to provide a coherent story as to why it terminated Mr. Sanchez's employment, and why it terminated Sanchez on the day he was slated to return to work. Indeed, CPS has brought forth wildly inconsistent and illogical reasons for its actions, created unwritten policies on the fly, admitted to ignoring its own established and written policies, and claimed ignorance of its internal documents and usual processes.

3.      From the outset of this lawsuit, CPS has represented that Mr. Sanchez had been terminated "because of his pattern of safety violations that exhibited poor judgment and a continued failure to follow critical work instructions." But discovery revealed that only one safety event (the September 21, 2015 flash event) was discussed at a February 23, 2016 meeting where the termination decision was made. It is not possible to establish a ***pattern*** based on only one event. CPS also made a misrepresentation to the Equal Employment Opportunity Commission ("EEOC") in response to Mr. Sanchez's Charge of Discrimination. CPS told the EEOC that "[a]s a result of multiple incidents that occurred in 2015, CPS Energy terminated Sanchez's employment under its Corrective Action Policy." Not only did the decision makers discuss only one safety event at the termination meeting, some of the decision makers testified that the termination was based on Mr. Sanchez's conduct from solely the September 21, 2015 flash event.

4.      The CPS employees who were allegedly involved in the decision to terminate Mr. Sanchez did not get their stories straight as to why they fired him. They contradicted each other not only about who made the termination decision and who was involved in the decision-making process, but also about what alleged misconduct on Mr. Sanchez's part caused them to terminate him. The level of inconsistency in their accounts in the termination process would allow any reasonable jury to conclude that Mr. Sanchez was not terminated for a "pattern of unsafe behavior, poor judgment, and failure to follow critical work instructions", but, rather, because Mr. Sanchez's PTSD condition was known to CPS. Indeed, one of the decision makers (Fred Bonewell), testified that another decision maker (Lauro Garza) **explained PTSD to him during a meeting "with respect to determining Mr. Sanchez's viability to work at CPS.**" EXHIBIT 18 (Bonewell Depo.), 67:12 – 20.

5.      Because there are genuine issues of material fact with respect to the elements of each of Mr. Sanchez's claims, summary judgment should be denied.

## II.      FACTUAL BACKGROUND

6.      Pursuant to Local Rule CV-7(d)(1) of the Western District of Texas, Mr. Sanchez attaches its Factual Background as Appendix A to this Response in Opposition to Defendant's Motion for Summary Judgment.

## III.      PLAINTIFF'S FAMILY MEDICAL LEAVE ACT VIOLATION CLAIM

7.      In order to focus the brief on the disability discrimination claim, Plaintiff waives the FMLA retaliation claim.

8.      Mr. Sanchez continues to assert that he was discriminated against because of an actual and/or perceived disability.

## IV.      SUMMARY JUDGMENT STANDARD OF REVIEW

9.      Summary judgment is appropriate if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(A); *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 – 52 (1986).

10.     "An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict in favor of the nonmoving party. *See Hamilton v. Segue Software Inc.*, 232 F.3d 473, 477 (5th Cir.2000); *see also Anderson*, 477 U.S. at 248. "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit." *Id*.

11.     In deciding whether a fact issue has been created, the court must draw all reasonable inferences in favor of the nonmoving party, and it "may not make credibility determinations or weigh the evidence." *See Tiblier v. Dlabal*, 743 F.3d 1004, 1007 (5th Cir. 2014) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)). At the summary judgment stage, evidence need not be authenticated or otherwise presented in an admissible form. *See* FED. R. CIV. P. 56(C); *Lee v. Offshore Logistical & Transp., LLC*, 859 F.3d 353, 355 (5th Cir. 2017).

## V.     METHOD OF PROOF

12.     "Direct evidence" of discrimination is extremely rare. Indeed, "[e]mployers rarely leave concrete evidence of their retaliatory purposes and motives." *See Tejada v. Travis Ass'n for the Blind*, 617 F. App'x 325, 328 (5th Cir. 2015). Consequently, courts permit plaintiff-employees to rely upon "circumstantial evidence", which "is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." *See Desert Palace v. Costa*, 539 U.S. 90, 100 (2003) (quoting *Rogers v. Missouri Pacific R. Co.*, 352 U.S. 500, 508, n. 17 (1957)).

## VI.     ARGUMENTS & AUTHORITIES

**A.     A reasonable jury could find that CPS Energy discriminated against Mr. Sanchez because of his disability in violation of the ADA.**

---

13.    The Americans with Disabilities Act of 1990 as amended in 2008 ("ADA") prohibits employers from discriminating "against a qualified individual on the basis of [a] disability in regard to…[the] discharge of employees." 42 U.S.C. § 12112(a). To establish a prima facie case of discrimination under the ADA, Mr. Sanchez must show that: (1) he has a disability, or was regarded as disabled; (2) he was qualified for the job; and (3) he was subject to an adverse employment decision on account of his disability. *See Cannon v. Jacobs Field Servs., N.Am., Inc.*, 813 F.3d 586, 590 (5th Cir. 2016); *see also* 42 U.S.C. § 12102 (1). To establish a *prima facie* case, Mr. Sanchez need simply demonstrate that there exists an issue of fact as to each element. *See Connor v. Hoechst Celanese Chem., Inc.*, 211 Fed. App'x 257, 260 (5th Cir. 2006).

14.    CPS states in its Motion that it does not dispute whether Mr. Sanchez can satisfy the first element of his ADA prima facie burden. *See CPS' Motion, p. 8, n.6.* Thus, for purposes of its Motion CPS does not dispute that Mr. Sanchez can establish he suffered from a disability and that CPS regarded Mr. Sanchez as disabled. *Id* Furthermore, CPS does not dispute that it took an adverse action against Mr. Sanchez. *Id*. at p. 8. CPS does, however, dispute that Mr. Sanchez was qualified for his job at the time of his discharge and that either Mr. Sanchez's actual or perceived PTSD diagnosis was casually connected in any way to his discharge. *Id*.

   **a.    *Mr. Sanchez was qualified to serve as a Journeyman Cable Splicer at the time of his March 8, 2016 termination.***

15.    The evidence demonstrates that Mr. Sanchez was well qualified for his job. CPS contends, however, that Mr. Sanchez "was not qualified since he was not released to return work and a subsequent recommendation prevented him from returning" to his position. *See CPS' Motion, p. 8*. CPS' contention is both legally and factually incorrect.

16.     An ADA plaintiff-employee can prove that he is qualified by showing "either: [he] could perform the essential functions of the job in spite of [his] disability," or "(2) that a reasonable accommodation of [his] disability would have enabled [him] to perform the essential functions of the job." *See Moss v. Harris Cty. Constable Precinct One*, 851 F.3d 413, 417-18 (5th Cir. 2017) (quoting *E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 697 (5th Cir. 2014)); *see also Cannon*, 813 F.3d at 592. "'Time off, whether paid or unpaid, can be a reasonable accommodation, but an employer is not required to provide a disabled employee with indefinite leave.'" *See Moss,* 851 F.3d at 418 (quoting *Delaval v. PTech Drilling Tubulars, L.L.C.,* 824 F.3d 476, 480 (5th Cir. 2016)). "[T]he question is whether [Mr. Sanchez] was qualified at the time of his termination." *Id*. "Although taking leave that is limited in duration may be a reasonable accommodation to enable an employee to perform the essential functions of the job upon return, taking leave without a specified date to return or…with the intent of never returning is not a reasonable accommodation." *Id*. at 419.

17.     In *Moss* (one of the cases relied upon by CPS in its Motion), the court found that the plaintiff-employee was not qualified on the date of his termination (April 16, 2013) because he was "medically incapable of performing his duties" thereby rendering him unqualified "unless some reasonable accommodation [could] be identified that would have enabled him to perform the job."   *Id*. at 418-9. But the court stated that the plaintiff-employee did not identify a reasonable accommodation because he never had an intent to actually return to work. *Id*. at 419. Though the plaintiff-employee submitted a letter indicating that his leave would last only until May 31, 2013, there was evidence in the record that revealed the plaintiff-employee was set to retire on the very last day of his leave. *Id* 418 – 419. According to the court, the plaintiff-employee "would take leave and never return, which is not a reasonable accommodation and

would never enable him to perform the essential functions of his job." *Id.* at 419 – 20. The facts in this case are clearly distinguishable from *Moss*.

18.    First, there is not a shred of evidence in this lawsuit that rendered Mr. Sanchez "medically incapable" of performing his job duties at the time of his termination on March 8, 2016. To the contrary, Mr. Sanchez testified during his November 2018 deposition that 1) he is fully capable of performing work as a cable splicer, 2) his PTSD does not affect his ability to work as a cable splicer, and 3) his PTSD does not affect his ability to work in any way. EXHIBIT 8, 84:6 – 85:10. CPS contends that Dr. Michael McMains, one of Mr. Sanchez's treating physicians, "indicated [Mr. Sanchez] should no longer work in a job that involves 'electrical work.'" *See CPS' Motion, p. 9*. In reality, the medical evaluation that CPS cites to states, "[a]s for [Mr. Sanchez]'s abilities to return to work, it is **recommended** that [Mr. Sanchez] return to full time employment but in a job that is not related to electrical work." *See CPS' Motion, Exhibit 48, p. 4*. A "recommendation" does not render an employee incapable of performing his duties. Not to mention the medical evaluation is dated May 19, 2016, which is more than **two months after Mr. Sanchez was notified of his termination** on March 8, 2016 and approximately **three months after CPS made the decision to terminate** on February 23, 2016.

19.    Furthermore, though Mr. Sanchez may have exhausted twelve weeks of FMLA leave, it is undisputed that he was well within the thirteen (13) month leave afforded CPS employees. *See* Pl.'s App'x at p. 65 – 66 (citing EXHIBIT 42 (CPS' Medical Leave Policy) and EXHIBIT 43 (Feb. 15, 2016 Jarzombek Ltr.).

20.    Additionally, CPS was well aware that Mr. Sanchez was set to return to work on March 7, 2016, which was one (1) day prior to his termination. *See* Pl.'s App'x at p. 61 – 63 and p. 65 –

66 (citing EXHIBIT 38, ("TWC Work Status Report") and discussing CPS' knowledge that Mr. Sanchez was set to return to work after March 7, 2016). CPS received a Texas Workers' Compensation ("TWC") Work Status Report on January 25, 2016 that stated Mr. Sanchez's PTSD prevented him from returning to his job through March 7, 2016. *See* EXHIBIT 38 ("Feb. 3, 2016 E-Mail w/ TWC Work Status Report). Lisa Jarzombek (Benefit Analyst IV) informed Richard Lujan (Mr. Sanchez's supervisor), Mark Michalek (Mr. Sanchez's Manager), Gloria Esquivel (Human Resources), Kipling Giles (Legal Dept.), the nurses in "Occupational Health", and the "Leave team" that Mr. Sanchez would remain off of work until March 7, 2016. *See* Pl.'s App'x at p. 62 – 63. Further, Mr. Sanchez informed Veronica Zuniga (Senior HR Generalist) in February 2016, via a phone call, that he was about to return to work. *Id.* at p. 65 – 66. Even one of the decision makers (Lisa Lewis, Vice President of People & Culture) testified she was made aware of Mr. Sanchez's impending return by another decision maker (Lauro Garza) and that gave rise to the February 23, 2016 termination meeting. *Id*. In fact, CPS concedes on <u>p. 23 in Def. Appendix-A to its Motion</u> that it was aware Mr. Sanchez was set to return to work on March 8, 2016.  *See CPS' Motion, Appendix-A, p. 23* ("on March 8, 2016, the day after Sanchez was supposed to return to work based on the last medical documentation received").

21.    CPS also points to a TWC Work Status Report (dated March 21, 2016) that states Mr. Sanchez would actually be allowed to return to work on March 21, 2016. *See CPS' Motion, p. 9*. The reference to the March 21, 2016 TWC Work Status Report, which CPS did not receive until almost **two (2) weeks after it notified Mr. Sanchez of his termination**, strengthens Mr. Sanchez's argument that he was qualified to work on the date of his termination because clearly his leave was not indefinite, whether it was set to end on March 7, 2016 or March 21, 2016. The

evidence in this case proves that Mr. Sanchez was able to return to work and that he was not rendered medically incapable of performing his job as a Journeyman Cable Splicer.

22.     The evidence also demonstrates that Mr. Sanchez was a well-qualified Journeyman Cable Splicer, who had a successful 16-year career at CPS. *See* Pl.'s App'x. at p. 10 – 12. Indeed, even in 2015 (when CPS claims Mr. Sanchez developed a "pattern of poor unsafe behavior, poor judgment, and failure to follow critical work instructions"), Mr. Sanchez received a rating of "highly valued" on his 2015 performance appraisal. *See* EXHIBIT 6 (2015 Wage Scale Appraisal, D-GS 1021 – 1023).

**b.      Mr. Sanchez was terminated for an actual and/or perception of disability.**

23.     CPS terminated Mr. Sanchez on March 8, 2016. As mentioned hereinabove, CPS does not dispute that Mr. Sanchez was subject to an adverse employment decision. *See CPS' Motion, p. 8.* For purposes of its Motion, CPS also does not dispute that Mr. Sanchez had an actual disability ("PTSD") or that CPS regarded Mr. Sanchez as disabled. *Id.* at *n.6.* There is ample evidence in the record to show that CPS' termination of Mr. Sanchez's employment was on account of his disability and/or a perception of disability.

*i.      CPS placed Plaintiff on a purported Actively Caring & Safety Readiness Plan instead of a Performance Improvement Plan after it learned Plaintiff had PTSD.*

24.     As discussed in Plaintiff's Appendix, Plaintiff was involved in a March 2014 flash incident that caused him severe burn injuries after he was instructed by his supervisor to check the voltage of improperly marked cable. *See* Pl.'s App'x p. 12 – 14. This flash was caused due to no fault of Plaintiff. *Id.* Plaintiff was not disciplined or given corrective action in any manner. *Id.* Indeed, a root cause analysis conducted by CPS revealed that Plaintiff did not violate a single CPS policy. *Id.*

25.    The following year, 2015, CPS allegedly contemplated placing Plaintiff on a Performance Improvement Plan ("PIP") due to alleged safety violations in March and early May of 2015. *Id*. at p. 27 – 32. At some point during the PIP discussions, Plaintiff reported fears that he had in performing certain aspects of his job to Richard Lujan. *See* Pl's App'x at p. 32 – 35. Lujan told Plaintiff that he knew "what [Plaintiff] was going through, it was PTSD, because his father is in law enforcement and he knows what that's about." *Id*. at p. 33. It is important to note that it is undisputed that Lisa Lewis, Fred Bonewell, David Luschen, and Veronica Zuniga were made aware of Plaintiff's reported fears. *Id*. at p. 33 – 35.

26.    Thereafter, CPS scrapped its proposed PIP and instead placed Plaintiff on a purported Actively Caring & Safety Readiness Plan *("Actively Caring Plan")*. Pl's App'x at p. 35 – 43. Termination decision-makers Lisa Lewis, David Luschen, and non decision-maker Richard Lujan testified that Plaintiff was placed on an *Actively Caring Plan* as a result of his reported fears. *Id*. at p. 38 – 40. The ostensible *Actively Caring Plan* required Plaintiff to 1) work under the supervision of a foreman, and 2) attend mandatory counseling sessions through CPS' Employment Assistance Program ("EAP"), which utilized a contractor known as Deer Oaks. *Id*. at p. 35 – 36. One of the functions of EAP is mental health counseling. Pl.'s App'x at p. 58.

27.    CPS created the *Actively Caring Plan* for Mr. Sanchez. Pl.'s App'x at p. 14 – 18. Indeed, discovery revealed that *Actively Caring* is not an actual CPS policy. *Id*. *Actively Caring* is not reflected in CPS' employment handbook and there has not been a single written document evidencing an *Actively Caring* policy produced in this case. *Id*. Decision-maker Fred Bonewell listed three (3) documents in his deposition that he contends reflects CPS' written *Actively Caring* policy. *Id*. at p. 16 – 17. Those documents consist of a book and two power point presentations that do not come remotely close to resembling a workplace policy. EXHIBIT 21

("Actively Caring" Chapter of the <u>Keys to Behavior-Based Safety from Safety Performance Solutions</u> book); EXHIBIT 19 (May 2015 Presentation); EXHIBIT 20 (March 26, 2014 Presentation). Further, none of the deponents had ever dealt with, or even heard of, *Actively Caring* until CPS placed Mr. Sanchez on the purported plan. *Id*. at p. 15. In fact, one of the deponents (Lisa Jarzombek) had not heard of *Actively Caring* even at the time of her deposition. *Id*.

28.    CPS' decision to scrap its proposed PIP and place Plaintiff on an *Actively Caring Plan* occurred only after it learned that Plaintiff suffered from symptoms of PTSD.

> ii.    ***The decision makers discussed PTSD with regard to Mr. Sanchez during the February 23, 2016 termination meeting.***

29.    The termination decision was allegedly made during a February 23, 2016 meeting. *See CPS' Motion, Appendix-A, p. 22*. CPS contends that the attendees of this meeting included: 1) Lisa Lewis, Paul Barham, Fred Bonewell, Rick Maldonado, David Luschen, and Lauro Garza. *Id*.; *see also id*. at p. 22, n. 21.

30.    It is undisputed that Plaintiff reported that he was diagnosed with PTSD to Richard Lujan on September 21, 2015. *See* Pl.'s App'x. at p. 60. Likewise, it's undisputed that Richard Lujan relayed the information concerning the PTSD diagnosis on September 21, 2015. *Id*. at p. 59, p. 62.

31.    Fred Bonewell testified that he learned about PTSD from Lauro Garza during a meeting to discuss Mr. Sanchez's "**viability to work at CPS.**" EXHIBIT 18 (Bonewell Depo.) 67:8 – 20. Specifically, Fred Bonewell stated with regard to his conversation with Lauro Garza:

> [W]e had a **collaborative meeting with respect to determining Mr. Sanchez's viability to work at CPS**, **Mr. Garza explained to me what PTSD is**. It's the first time I heard about that. I did not grow up here. I wasn't necessarily from a military family. But he

Page 11

> told me about PTSD at that time frame. That's the first time I
> became aware of it.

*Id.* (emphasis added); *see also* Pl.'s App'x, p. 5, p. 58 – 61, and p. 64. Bonewell ultimately conceded this conversation took place in 2016 and could've occurred prior to Plaintiff's termination. EXHIBIT 18 at 100:17 – 101:12. Bonewell further testified that he could only recall one (1) meeting regarding Mr. Sanchez after the September 21, 2015 Flash Event. *Id. at* 82:14 – 84:23 and 93:13 – 21. This meeting occurred in 2016 while "Mr. Sanchez was on leave…being treated for his medical conditions relative to the flash." *Id.*

32.     Likewise, Lauro Garza testified that he could only recall one (1) meeting after September 21, 2015 regarding the discussion as to what was to be done with Mr. Sanchez. EXHIBIT 13 (Garza Depo.), 157:7 – 11. Since Garza and Bonewell, two of the termination decision-makers, admit they had only one meeting after the September 21, 2015 flash event wherein they discussed Plaintiff's fate at CPS, the 2016 conversation concerning Mr. Sanchez' PTSD could only have occurred at the February 23, 2016 termination meeting. At the very least, this is a fact issue for a jury to consider. This evidence alone establishes the third prong of Mr. Sanchez's *prima facie* burden, that the termination decision is connected to Plaintiff's PTSD.

> ### iii.     There is ample evidence to demonstrate that CPS' stated reasons for Mr. Sanchez's termination are pretext and the termination was connected to Mr. Sanchez's PTSD.

33.     Assuming *arguendo* that a defendant has met its burden of production of a legitimate, nondiscriminatory reason for termination, "the burden shifts to the plaintiff to establish that the reason provided by the employer is a pretext for discrimination." *See Mesa v. City of San Antonio,* SA-17-CV-654-XR, 2018 U.S. Dist. LEXIS 138896, *53 (W.D. Tex. Aug. 16, 2018). "In the summary-judgment context, the question is not whether the plaintiff proves pretext, but rather whether the plaintiff raises a genuine issue of fact regarding pretext." *Id.*

34.     "Pretext may be shown when "the employer's stated reason for the adverse employment action either (1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action." *See Vallejo v. North East Indep. Sch. Dist.*, No. SA-12-CA-270-XR, 2013 U.S. Dist. LEXIS 84502, at *24 (W.D. Tex. June 17, 2013) (quoting *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 393 (6th Cir. 2008).

35.     There are several ways in which a plaintiff in an employment discrimination case can show existence of a fact issue as to pretext. One such way is for the plaintiff to show that the defendant's stated reason for termination is false or unworthy of credence. As the Supreme Court has held, "[a] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *See Reeves v. Sanderson Plumbing Prods.,* 530 U.S. 133, 148 (2000). In other words, "[e]vidence demonstrating that the employer's explanation is false or unworthy of credence, taken together with the plaintiff's prima facie case, is likely to support an inference of discrimination even without further evidence of defendant's true motive." *See Laxton v. Gap Inc.,* 333 F.3d 572, 578 (5th Cir. 2003).

36.     Accordingly, to "establish that an employer's proffered reason for an adverse action against an employee is pretextual under Title VII, the employee is required to demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in defendant's proffered reasons such that "a reasonable factfinder could rationally find them unworthy of credence." *See Wojciechowski v. Nat'l Oilwell Varco, L.P.*, 763 F. Supp. 2d 832, 859 (S.D. Tex. 2011). Furthermore, "[a] court may infer pretext where a defendant has provided inconsistent or conflicting explanations for its conduct." *See Nasti v. CIBA Specialty Chemicals Corp*., 492 F.3d 589, 594 (5th Cir. 2007).

PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

a)      <u>**Conflicting evidence regarding the stated reason for termination.**</u>

37.     CPS informed Mr. Sanchez he exhibited a "pattern of poor judgment, unsafe acts & behavior and unwillingness to follow critical work instructions" via its March 8, 2016 termination letter. EXHIBIT 36 (Sanchez Termination Ltr.). CPS represented to EEOC that it terminated Mr. Sanchez's employment "[a]s a result of multiple incidents that occurred in 2015." EXHIBIT 14 (CPS EEOC Pos. Stmt.), p. 2. However, the decision-makers' provided material inconsistences as to CPS' alleged reasons for termination. Specifically, deposition testimony revealed that Mr. Sanchez was not terminated for a **pattern** of behavior because the decision to terminate was based on only one (1) safety event.

38.     CPS asserts that the decision to terminate Mr. Sanchez's employment was made on February 23, 2016 in a termination meeting. *See* Pl.'s App'x at p. 5. Lisa Lewis and Fred Bonewell both testified that only one (1) event, the September 21, 2015 Flash Event, was discussed during the February 23, 2016 termination meeting. *See* Pl.'s App'x. at p. 8 – 10. They both testified that neither Plaintiff's Corrective Action history nor his safety history was discussed during the February 23, 2016 termination meeting. *Id*. Further, Lewis and Bonewell testified that the purported *Actively Caring & Safety Readiness Plan* pertaining to Mr. Sanchez was not discussed during the termination meeting. *Id*. Lisa Lewis confirmed that there were no documents shared at the termination meeting, and Fred Bonewell could not recall any documents being shared at the termination meeting. *Id*. Lisa Lewis further testified that Mr. Sanchez's performance appraisals were not discussed during the termination meeting and that she in fact had never seen Mr. Sanchez's performance appraisals. *Id*. at p. 8 – 9. Lisa Lewis testified that she terminated Plaintiff for conduct that occurred on September 21, 2015 and that no other conduct went into the decision to terminate Mr. Sanchez's employment. *Id*. at 9.

39.     The testimony of these two CPS decision-makers is wholly inconsistent with the story CPS has presented.  How could Mr. Sanchez be terminated for a ***pattern*** of behavior if only one event was discussed at the termination meeting? How could Mr. Sanchez be terminated for a pattern of behavior if Lisa Lewis testified under oath that the termination decision was only based on conduct that arose from the September 21, 2015 Flash Event, that she was unaware of his performance evaluations, and safety history and corrective actions were not discussed?

40.     In its motion for summary judgment, CPS now attempts to alter Lisa Lewis' testimony by way of declaration at adopt the termination rationale of a "<u>*pattern*</u> of poor judgment, unsafe behavior, and unwillingness to follow critical work instructions that culminated in a September 2015 incident." *See CPS' Motion, Exhibit 11, p. 3, ¶6.* Such an attempt is "disingenuous and inconsistent." *See Gee v. Principi*, 289 F.3d 342, 347 (5th Cir. 2002). Lisa Lewis's declaration, filled with contradictions from her testimony, amounts to nothing more than a sham affidavit. *See Aikins v. Warrior Energy Servs. Corp.*, No. 6:13-CV-54, 2015 U.S. Dist. LEXIS 32870, at *8 ("requires an 'inherent inconsistency' between the declaration and the declarant's earlier deposition testimony."). *Contra* Pl.'s App'x at p. 8 – 10.

41.     Lisa Lewis and Fred Bonewell's deposition testimony alone renders CPS' stated reasons for termination illogical. But the testimony of the other two individuals who were represented as decision makers solidifies CPS' stated reasons as nonsensical.

42.     David Luschen (alleged decision maker) testified that he was never involved in a meeting concerning the decision to terminate Mr. Sanchez's employment. Pl.'s App'x at p. 7. David Luschen testified that the termination decision would have been made in a "C-Suite", that he would have been present for the "C-Suite" meeting, and he "was not in a meeting where they had a C-Suite." *Id*. (citing EXHIBIT 12 (Luschen Depo). Conversely, David Luschen testified that

the following safety events went into his decision to terminate Mr. Sanchez's employment: 1) March 12 2015 event (involving the pot of splice compound), 2) May 1 2015 event (involving the sawzall), 3) May 8 2015 event (involving the raised bucket), and 4) September 21 Flash Event. EXHIBIT 12 (Luschen Depo.), 24:24 – 25:7, 31:14 – 33:4, 37:17 – 38:2, and 38:11 – 22. David Luschen's testimony directly contradicts Lisa Lewis' and Fred Bonewell's testimony.

43.    Lauro Garza (alleged decision maker) testified that he could recall just one meeting concerning Mr. Sanchez's employment status after September 21, 2015. Pl.'s App'x at p. 7. But Garza recalled that the meeting concerning Mr. Sanchez's employment status occurred in late September 2015 or October 2015, which is not even remotely close in time to the alleged February 2016 termination meeting. *Id*. When asked about his knowledge of the termination reasons, Lauro Garza simply replied, "They're listed in the termination letter…[b]ut essentially violation of safety rules, procedures, and then the history of unsafe acts, failure to report; all those factors there." EXHIBIT 13 (Garza Depo.) 178:23 – 179:4. Similar to Luschen, Garza's testimony contradicts the termination rationale testimony of Lewis and Bonewell.

44.    CPS' stated reasons for Mr. Sanchez's termination are nonsensical, illogical, and have changed over the course of this litigation. The fact that its alleged decision makers were not on the same page during their depositions is telling. "A court may infer pretext where a defendant has provided inconsistent or conflicting explanations for its conduct." *See Nasti v. CIBA Specialty Chem. Corp.*, 492 F.3d 589, 594 (5th Cir. 2007).

          **b)**  **Conflicting evidence as to who made the decision to terminate Mr. Sanchez's employment.**

              **1)**  **Individuals who made the decision to terminate Mr. Sanchez's employment.**

45.     CPS has also presented an inconsistent story as to who made the termination decision. In response to written discovery, CPS represented that the following individuals made the termination decision (after consulting with CPS' Legal Department): 1) Paul Barham, 2) Fred Bonewell, 3) Lauro Garza, 4) Lisa Lewis, 5) David Luschen, and 6) Rick Maldonado. *See* Pl.'s App'x at p. 3. CPS now claims that David Luschen and Lauro Garza merely "recommend[ed] the type of action to be taken" with regard to Mr. Sanchez's employment. *See CPS' Motion, p. 22*. The testimony of the alleged decision makers, whoever they are, added to the confusion.

46.     Lisa Lewis testified that she and David Luschen, Paul Barham, Fred Bonewell, and CPS' legal counsel made the decision to terminate Mr. Sanchez's employment. *See* Pl.'s App'x at p. 3 – 4. She did not include Lauro Garza or Rick Maldonado in her list of decision makers during her deposition. *Id*. However, she has since changed her story by way of her declaration. *Id*. Now Lisa Lewis contends that she and Paul Barham, Fred Bonewell, and Rick Maldonado made the termination decision. *See CPS' Motion, Exhibit 11, p. 3 ¶6*. She also now contends that David Luschen and Lauro Garza merely recommended that Mr. Sanchez be terminated. *Id*.

47.     David Luschen testified that the decision makers included himself, Rick Maldonado, Paul Barham, Jelynne LeBlanc-Burley (CPS' Group EVP of Energy Delivery & Customer Service and Chief Delivery Officer), Human Resources, Paul Gold-Williams (CPS' Chief Executive Officer), and CPS' Legal Department. *See* Pl.'s App'x. at p. 4.

### 2) Individuals who allegedly attended the February 23, 2016 termination meeting.

48.     CPS has painted a muddled picture as to the attendees of the February 23, 2016 termination meeting. According to CPS, the attendees included: 1) Lisa Lewis, 2) Paul Barham, 3) Fred Bonewell, 4) Rick Maldonado, 5) David Luschen, 6) Lauro Garza, and 7) CPS' in-house counsel. *See CPS' Motion, Appendix-A, p. 22, n. 21*. CPS stated that Richard Lujan was not in

attendance at the February 23, 2016 termination meeting. *Id.* at n. 22. Yet again, CPS' assertions to the Court are contradicted by deposition testimony.

49.     Fred Bonewell testified that the attendees at the termination meeting included: 1) Fred Bonewell, 2) Lisa Lewis, 3) Paul Barham, 4) David Luschen, 5) Richard Lujan, and 7) "someone from legal." *See* Pl.'s App'x. at p. 4 – 5 and p. 6. Notably, CPS contends that Richard Lujan did not attend the termination meeting. *See CPS' Motion, Appendix-A, p. 22, n. 22*. Further, Fred Bonewell did not include Lauro Garza in his list of attendees, but he testified earlier in his deposition that he had "a collaborative meeting with respect to **determining Mr. Sanchez's viability** to work at CPS" with Lauro Garza, when Lauro Garza explained PTSD to Fred Bonewell. *See* Pl.'s App'x. at p. 5, p. 58 – 61, and p. 64. Fred Bonewell testified that he recalled involvement in one (1) meeting regarding Mr. Sanchez after the September 21, 2015 flash incident. Pl.'s App'x. at p. 6.

50.     Lauro Garza recalled only one meeting after September 21, 2015 regarding the discussion as to what was to be done with Mr. Sanchez. *Id.* at p. 7. He recalled that the attendees included: 1) Lauro Garza, 2) Lisa Lewis, and 3) Fred Bonewell. *Id.* He did not include Paul Barham, Rick Maldonado, or David Luschen in his list of termination meeting attendees. *Id.*

51.     As discussed hereinabove, David Luschen (alleged decision maker) testified that he was never involved in a meeting concerning the decision the decision terminate Mr. Sanchez's employment. *Id.* at p. 7.

52.     Lisa Lewis testified that the attendees at the February 23, 2016 termination meeting included: 1) Lisa Lewis, 2) David Luschen, 3) Paul Barham, 4) Fred Bonewell, 5) Lauro Garza, 6) CPS' Legal Counsel, and 7) possibly "other support members." Pl.'s App'x at p. 6 – 7. Her testimony contradicts David Luschen's testimony as to not attending a termination meeting. In

her declaration, Lisa Lewis added Rick Maldonado to her list of the termination meeting attendees. *See CPS' Motion, Exhibit 11, p. 3, ¶6.* Her shifting recollections amount to further evidence of pretext. *Burrell v. Dr. Pepper/Seven Up Bottling Grp, Inc.*, 482 F.3d 408 (5th Cir. 2007) (shifting explanations can be evidence of pretext).

53.    The inconsistencies, changing of stories, and shifting recollections as to who made the termination decision, as well as who attended the February 23, 2016 termination meeting, give rise to evidence of pretext. *See Nasti v. CIBA Specialty Chem. Corp.*, 492 F.3d 589, 594 (5th Cir. 2007) ("A court may infer pretext where a defendant has provided inconsistent or conflicting explanations for its conduct."); *Burrell*, 482 F.3d 408 (5th Cir. 2007) (shifting explanations can be evidence of pretext); *Gee v. Principi*, 289 F.3d 342 (5th Cir. 2002) (same); *Aust v. Conroe Indep. Sch. Dist.*, 153 S.W.3d 222 (Tex. App.–Beaumont 2004, no pet.) (shifting explanations given by the employer for its decision).

### c)  Misrepresentations made to the EEOC.

54.    "A jury may view 'erroneous statements in [an] EEOC Position Statement as "circumstantial evidence of discrimination." *See Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 237 (5th Cir. 2015) (quoting *Miller v. Raytheon Co.,* 716 F.3d 138, 144 (5th Cir. 2015)). Courts "have also found an employer's rational 'suspect' where it had 'not remained the same' between the time of the EEOC's investigation and the ultimate litigation." *Id* (quoting *Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 415 (5th Cir. 2007)). Pretext can be demonstrated by the fact that CPS made material misrepresentations to the EEOC.

55.    CPS represented to the EEOC that "[a]s a result of multiple incidents that occurred in 2015, CPS Energy terminated Sanchez's employment under its Corrective Action Policy" and Mr. Sanchez's "employment ended because he had exhibited a pattern of poor judgment and

---

unsafe behavior in addition to demonstrating an unwillingness to follow critical work instructions and disregarding safe work practices". EXHIBIT 14 (CPS EEOC Pos. Stmt.), p. 2. However, these statements are materially misleading in light of the contradictions set out earlier in this Response at paragraphs 37-40 herein.

### d) Failure to follow CPS policies.

56. Discovery in this litigation revealed that CPS failed to follow its established policies. CPS exhibited a steep departure from its written policies, under highly suspicious circumstances, and resorted to unwritten and poorly described policies to deal with the Plaintiff after his May 2015 discussion of PTSD with his supervisor. "Departures from normal policy enacted by the employer may be evidence of pretext." *See Vallejo*, 2013 U.S. Dist. LEXIS 84502 at *24. "An employer's conscious, unexplained departure from its usual policies and procedures…may in appropriate circumstances support an inference of…discrimination." *See Tyler v. Union Oil Co. of Cal.*, 304 F.3d 379, 396 (5th Cir. 2002).

> **1) Lujan and Luschen failed to abide by CPS' EEO Anti-Harassment Policy by not informing Human Resources of Mr. Sanchez's report of disability harassment.**

57. On September 21, 2015, immediately prior to cutting the cable that caused the flash event, Mr. Sanchez was mocked and harassed by two CPS utility co-workers who were "making noises like an *explosion*" and told Mr. Sanchez, "*make sure you don't cut the wrong cable…[a]nd blow up.*" *See* Pl.'s App'x at p. 46 – 47. One of the utility workers told Mr. Sanchez to be sure he doesn't "blow up like last time." *Id*. It's important to note that this occurred months after the conversation between Plaintiff and Richard Lujan regarding Plaintiff's fears, whereby Richard Lujan related Plaintiff's mental condition to PTSD. *Id*. at p. 58.

Following the discriminatory harassment, Mr. Sanchez cut the incorrect cable and was injured from a flash. *Id*. at p. 47. Mr. Sanchez was subsequently hospitalized. *Id*.

58.     As mentioned above, Richard Lujan visited Mr. Sanchez in the hospital on the eve of the September 21 2015 Flash Event. It is undisputed that Mr. Sanchez informed Richard Lujan that night that a military doctor diagnosed him with PTSD. *Id*. at p. 51. It is also undisputed that Mr. Sanchez reported the harassment he experienced by the utility workers to Richard Lujan at the hospital. *Id*. Indeed, Richard Lujan confirmed that the conduct Mr. Sanchez reported would violate CPS policy. *Id*. Lisa Lewis also testified that the conduct "would not be compliant with policy." *Id*. at p. 52 (testifying in reference to CPS' EEO Anti-Harassment Policy).

59.     CPS has taken the position that the mocking type of conduct Mr. Sanchez reported to Lujan at the hospital does not fall within its EEO Anti-Harassment Policy *Id*. In fact, Lisa Lewis (after multiple breaks and chances to confer with CPS' counsel) changed her testimony and claimed that the type of conduct reported by Mr. Sanchez would <u>not</u> have fallen under CPS' EEO Anti-Harassment Policy because the policy "specifically speaks to protected class." *Id*. That is simply not correct. CPS' EEO Anti-Harassment Policy applies to all CPS employees and covers **behavior or comment that creates a hostile, intimidating, or offensive work environment or which adversely affects an individual's employment.** *Id*. at p. 52 – 53. The conduct Mr. Sanchez reported clearly fell within the EEO Harassment Policy.

60.     The evidence demonstrates Richard Lujan failed to report Mr. Sanchez's harassment complaint to CPS' Employee Relations ("ER") staff (Human Resources). *Id*. at p. 53 – 55. Richard Lujan was clearly obligated to bring Mr. Sanchez's report to the ER staff. *Id*. (citing the harassment policy); *see also Id*. at p. 51 (citing EXHIBIT 15 (Lewis Depo.) ("would have

Page 21

expected Mr. Lujan to have shared that information with his Generalist) ("would not be compliant with policy."). His failure to do so was a failure to abide by CPS policy. *Id*.

61.     David Luschen also failed to follow CPS' harassment policy. Richard Lujan reported Mr. Sanchez's complaint to his supervisor David Luschen on September 21, 2015, after he spoke to Mr. Sanchez in the hospital. *Id*. at p. 53 – 54. Richard Lujan also informed David Luschen about Mr. Sanchez's PTSD diagnosis. *Id*. at p. 62. There is no evidence that David Luschen took Mr. Sanchez's harassment report to the ER staff. Lisa Lewis, Fred Bonewell, Lauro Garza, and Mark Michalek each testified that the first time they heard about Mr. Sanchez's harassment report was during their deposition. *See* Pl. App'x at p. 51 and 54 – 55.

62.     Richard Lujan and David Luschen's failure to bring Mr. Sanchez's report of harassment to the ER staff was a failure to abide by CPS' harassment policy. Their inaction is highly suspicious considering that they had just been made aware of Mr. Sanchez's formal PTSD diagnosis.

### 2) CPS did not create an SEN for the May 1, 2015 event (sawzall) or the May 8, 2015 event (raised bucket).

63.     CPS has taken the position throughout this lawsuit that Mr. Sanchez committed safety violations with regard to the May 1, 2015 event (Pl.'s App'x at p. 21 – 24) and the May 8, 2015 event (Pl.'s App'x at p. 25 – 27). Richard Lujan testified that CPS creates a "Safety Event Notification" ("SEN") whenever an incident occurs involving a safety event. EXHIBIT 10 (Lujan Depo.), 16:25 – 17:16. Lujan testified that "any safety event" could give rise to an SEN. *Id*. CPS produced a "Safety Event Reporting Matrix" that specifies when a root cause analysis "RCA" *Id*; EXHIBIT 44 ("Safety Event Reporting Matrix"). According to Richard Lujan, "[a]n SEN is recorded after every safety incident." *Id*.  Though CPS claims these two events as a basis for termination, there are no SEN's with regard to the May 1, 2015 or May 8, 2015 alleged safety

violations. CPS failed to abide by its own policy and reporting procedures and now claims that these two events constituted violations of safety. If they weren't safety violations back then, then they aren't safety violations now. CPS' failure to abide by its policy is further evidence of pretext.

### 3) CPS did not conduct an RCA into the September 21 Flash Event.

64.   It is undisputed that CPS did not conduct a root cause analysis into the September 21, 2015 Flash Event. *See CPS' Motion, Appendix-A, p. 20, n. 17.* Instead, CPS contends that its "Legal Department handled any further review and determined the facts surrounding the September 2015 incident."[1] CPS contends that "root cause analyses are not automatic and rather are done at the discretion of the President and CEO", but that is directly contradicted by Richard Lujan. *Id*; EXHIBIT 10 (Lujan Depo.), 16:25 – 17:16. Richard Lujan testified that the Safety Reporting Matrix (EXHIBIT 44) "specifies when an RCA is **required**." EXHIBIT 10 (Lujan Depo.) 16:25 – 17:16 (emphasis added).

65.   It is undisputed that the September 21, 2015 flash was a "Primary Flash." EXHIBIT 45 (SEN – Sept. 21, 2015). Thus, an RCA was required per the Safety Reporting Matrix that applied at the time. EXHIBIT 44 (Safety Reporting Matrix). In fact, David Luschen testified that he was instructed to start an RCA with regard September 21 Flash Event, but ultimately an RCA was not performed. *See* Pl.'s App'x at p. 57. David Luschen, as well as the others deposed in this lawsuit, were allegedly unaware as to why CPS did not conduct an RCA into the September 21 Flash Event. CPS' failure to do so was a violation of its policies and procedures. EXHIBIT 44 (Safety Reporting Matrix); EXHIBIT 45 (SEN – Sept. 21, 2015); EXHIBIT 10 (Lujan Depo.) 16:25 – 17:16 (the Safety Reporting Matrix "specifies when an RCA is required").

---

[1] The fact that CPS engaged its Legal Department to review an electrical flash event is highly suspicious considering Plaintiff's reported PTSD diagnosis on September 21, 2015.

### e)  <u>Lack of Documentation.</u>

66.    A jury may infer circumstantial evidence of pretext where there is a lack of documents where one would normally expect documents to exist. *See Burton*, 798 F.3d at 240. A reasonable jury could find pretext in the lack of documentation regarding Richard Lujan's alleged investigation into Mr. Sanchez's September 21, 2015 report of harassment, the several events CPS now contends were safety violations committed by Plaintiff, CPS' purported and unwritten Actively *Caring & Safety Readiness* policy, and the mandate of Mr. Sanchez's EAP attendance.

> **1)  Lack of documents evidencing Lujan's alleged investigation into Mr. Sanchez's September 21, 2015 report of harassment.**

67.    As discussed above, Richard Lujan failed to bring Mr. Sanchez's complaint of harassment to CPS' ER staff. Instead, Richard Lujan contends that he conducted an investigation into Mr. Sanchez's complaint to determine if CPS' EEO Anti-Harassment Policy was violated. *See* Pl.'s App'x. at p. 55 – 56. His alleged investigation consisted of speaking to two of the employees involved in the harassment while in the presence of their manager. *Id.* at p. 55. CPS contends "no one corroborated Sanchez's claim." *See CPS' Motion, Appendix-A, p. 17*. Yet not a single document has been produced in this litigation to evidence Richard Lujan's alleged investigation. *See* Pl.'s App'x. at p. 55.

68.    On the other hand, CPS produced handwritten and typed witness statements taken with regard to the investigation Richard Lujan conducted into the September 21, 2015 Flash Event prior to learning of Mr. Sanchez's formal PTSD diagnosis and complaint of harassment. *Id.* at p. 55 – 56. Further, David Luschen confirmed in his deposition that Richard Lujan's alleged harassment investigation was not conducted in a manner similar to that of his earlier investigation into the flash event. *Id.*

69. The lack of documentation to evidence Richard Lujan's harassment investigation is highly suspicious, especially considering the documents Richard Lujan's earlier investigation yielded, and is additional evidence of pretext. Tellingly, these two investigations are separated by an important event: Mr. Sanchez report of his formal PTSD diagnosis to Richard Lujan.

### 2) Lack of SENs for events CPS now contend constitutes safety violations.

70. As discussed above, CPS did not create an SEN for the May 1, 2015 (sawzall) event or the May 8, 2015 (raised bucket event). It goes without saying that if CPS truly considered those events to be safety events, then SEN's should have been issued. EXHIBIT 10 (Lujan Depo.), 16:25 – 17:16. This lack of documentation is additional evidence of pretextual nature of the alleged termination reason(s).

### 3) Lack of RCA documentation for the September 21, 2015 Flash Event.

71. It is undisputed that CPS did not conduct and RCA into the September 2,1 2015 Flash Event. As discussed above, CPS was required to conduct an RCA per its own procedures. The lack of RCA documentation is further evidence that CPS' contention that Mr. Sanchez's termination was based, in part, on the September 21, 2015 Flash Event is pretext.

### 4) Lack of Corrective Action Documentation.

72. It is undisputed that CPS did not consider Mr. Sanchez's Corrective Action history or his safety history when it discussed the termination decision. *See* Pl.'s App'x. at p. 7 – 10 (citing to EXHIBIT 15 (Lewis Depo.) and EXHIBIT 18 (Bonewell Depo)). But to the extent CPS contradicts its termination decision makers and contends that alleged multiple safety violations factored into the termination, there is a lack of written Corrective Action that would normally follow any safety violation.

73.     CPS did not issue written Corrective Action to Mr. Sanchez for the March 2014 Flash Event (Pl.'s App'x at p. 13 – 14), the May 1, 2015 event (sawzall) (Pl.'s App'x at p. 23 – 24), the May 8, 2015 (raised bucket event) (Pl.'s App'x at p. 26), or the September 21, 2015 Flash Event. The only written Corrective Action issued to Mr. Sanchez in 2015 was with regard to the March 12, 2015 propane burner event (pot of splice compound), in which Mr. Sanchez was told he would not receive Corrective Action for. *See* Pl.'s App'x. at p. 18 – 21. The written Corrective Action was issued approximately seven (7) weeks after the burner/splice compound event occurred. *Id*. at p. 19. Furthermore, the only Corrective Action that followed the September 21, 2015 Flash Event was Mr. Sanchez's termination, which occurred over five (5) months after the fact and after receiving the formal PTSD diagnosis.

74.     The fact that CPS did not issue contemporaneous Corrective Action begs the question as to whether CPS actually considered the 2015 alleged safety events to be violations at the time they occurred. At the very least, given the lack of written Corrective Action, a reasonable jury could conclude that CPS' termination justification is a pretext for its true intent to terminate Mr. Sanchez because of his PTSD.

### 5)  Lack of a written *Actively Caring & Safety Readiness* policy.

75.     The purported *Actively Caring & Safety Readiness Plan* ("*Actively Caring")* that CPS placed Mr. Sanchez on is pure fiction. The evidence demonstrates that it is not only not a CPS policy, it is not even a policy. It is uncontested that CPS placed Mr. Sanchez on *Actively Caring* instead of a Performance Improvement Plan ("PIP") after he reported having fears on the job to Richard Lujan. *See* Pl.'s App'x at p. 35 – 43. This is also the same conversation wherein Richard Lujan related Mr. Sanchez's fears to PTSD, given his experience with his father who suffered from PTSD. Pl.'s App'x at p. 32 – 33.

Page 26

---

76.     CPS contends that Fred Bonewell introduced the "actively caring safety philosophy.". Pl.'s App'x at p. 14. But the purported *Actively Caring* was not grounded in any actual CPS policy in 2015 (or even today). The deposition testimony adduced in this lawsuit is telling.

77.     David Luschen testified that he didn't know if *Actively Caring* was a CPS policy. *Id*. at p. 15 ("I don't know if it's a policy."). Richard Lujan stated in his deposition that *Actively Caring* was not a policy. *Id*. Veronica Zuniga (Senior Human Resources Generalist) testified that *Actively Caring* was "not a policy." *Id*.

78.     CPS claims Fred Bonewell introduced *Actively Caring* to CPS employees in March 2015. *CPS' Motion App'x-A at p. 5 and 11*. The deposition testimony proves otherwise. David Luschen testified that he did not have "knowledge of the detail" of *Actively Caring*, and he also testified that he didn't know whether it was "a written policy or not." Pl.'s App'x at p. 15. Veronica Zuniga testified that she didn't learn about *Actively Caring* until CPS notified Mr. Sanchez on June 5, 2015 that he was being placed on the supposed plan. *Id*. She further testified that she was unaware of the component parts of *Actively Caring*. *Id*. Lisa Jarzombek testified that she didn't know what *Actively Caring* was. *Id*.

79.     CPS contends that Fred Bonewell "distributed a copy of the book <u>Keys to Behavior-Based Safety from Safety Performance Solutions</u> to management level employees throughout the company." *See CPS' Motion, Appendix-A, p. 5 – 6*. Fred Bonewell testified the book was distributed to David Luschen, Richard Lujan, Lauro Garza, and Lisa Lewis. *See* Pl.'s App'x. at p. 15 – 16. The evidence demonstrates otherwise.

80.     David Luschen disavowed any knowledge as to whether *Actively Caring* was a written policy and he could not recall any direct communications with Fred Bonewell concerning *Actively Caring*. *Id*. at p. 16. Richard Lujan testified that *Actively Caring* was not a policy at

CPS. *Id*. at p. 15. Lauro Garza testified that he had never seen a written policy, procedure, or guideline that dealt with *Actively Caring*. *Id*. at p. 16. Lisa Lewis testified that the *Actively Caring* plan was not reduced to writing. *Id*. at p. 16 ("I've never seen a written document that is an actively caring or safety readiness plan.). She further testified that she was unaware of any resources utilized to put an *Actively Caring* plan together. *Id*.

81.     Even Fred Bonewell had significant trouble identifying the written components of *Actively Caring*. Pl.'s App'x at p. 16 – 17. After evading directly answering deposition questions, Fred Bonewell finally identified that the sum total of the alleged documents that evidence the *Actively Caring* policy are: 1) the book Keys to Behavior-Based Safety from Safety Performance Solutions, 2) a May 2015 Power Point presentation, and 3) a Power Point Presentation, dated March 26, 2014. *Id*. The documents Fred Bonewell claims comprises CPS' written *Actively Caring* policy do not resemble any type of policy. *Id*. The fact that Fred Bonewell was less than forthcoming in identifying the written components of the *Actively Caring* policy in conjunction with the fact that the documents he finally identified do not remotely resemble a workplace policy yield only one reasonable conclusion: the *Actively Caring* policy is a phantom. Furthermore, Mr. Sanchez was the very first employee to be placed on a purported *Actively Caring* plan. Clearly, the *Actively Caring* policy/plan is not an actual CPS policy, let alone an actual policy, which is further evidence of pretext.

### 6) Lack of documents with regard to Mr. Sanchez's EAP referral, as well as a lack of written procedures.

82.     As discussed hereinabove, after Plaintiff reported fears performing certain tasks, CPS mandated that Mr. Sanchez attend mandatory counseling session through its Employment Assistance Program ("EAP) with its mental health contractor Deer Oaks. *Id*. at p. 35 – 36. However, none of the individuals who made the decision to send Mr. Sanchez to EAP followed

up with Deer Oaks to determine whether the mental health treatment was successful, or even effective. *Id.* at p. 40 – 43.

83.     Though requested in discovery, there are no documents evidencing Plaintiff's required attendance at Deer Oaks, no documents evidencing communications between CPS and Deer Oaks, or any documents to suggest that CPS inquired of anyone as to whether Plaintiff's PTSD symptoms had resolved. *Id.* Further, there are no documents to evidence a policy or procedure with regard to handling an employee who was subject to a mandatory EAP referral. *Id.* The only written policy with regard to mandatory EAP falls under Corrective Action (which did not apply to Plaintiff) and does not explain the process CPS is to undertake to determine whether the employees mental health concerns and/or issues are resolved, nor does it explain how CPS is to confirm an employee's EAP attendance. EXHIBIT 26 (CPS' Corrective Action Policy), p. 4.

### f)  Failure to Investigate under highly suspicious circumstances.

84.     A failure to investigate under highly suspicious circumstances can be further evidence of pretext. *See Ion v. Chevron*, 731 F.3d 379 (5th Cir. 2013) ("Chevron's failure to conduct even the most cursory investigation … at the very least, creates a fact issue as to whether it would have terminated…despite its retaliatory motive.").

### 1)  CPS' failure to conduct an investigation into Mr. Sanchez's September 21, 2015 report of harassment.

85.     Though Richard Lujan and David Luschen contend that Lujan investigated Mr. Sanchez's report of harassment, the lack of contemporaneous documentation and the failure to report the complaint to CPS' ER staff suggests that an investigation never actually occurred. A lack of an investigation into Mr. Sanchez's harassment report is very suspicious given the fact that Mr. Sanchez reported his PTSD diagnosis to Richard Lujan at the same time he reported his complaint of harassment. *See* Pl.'s App'x at p. 50 – 51.

---

86.     The same goes for David Luschen. There are no documents in the record to evidence that David Luschen conducted an investigation into Mr. Sanchez's harassment report. *Id*. at 53 – 54. There is also no evidence that David Luschen reported Mr. Sanchez's complaint to the ER staff. David Luschen's failure to either investigate the harassment complaint and/or report the complaint to the ER staff is highly suspicious given David Luschen's knowledge at the time that Mr. Sanchez reported to Richard Lujan that he had been diagnosed with PTSD. *Id*. at p. 62.

### 2) CPS' failure to conduct an RCA into the September 21, 2015 Flash Event.

87.     As discussed hereinabove, CPS did not conduct an investigation into the September 21, 2015 Flash Event. Instead, CPS entrusted its Legal Department to review the facts and circumstances of an electrical flash event, which is highly suspicious on its own. CPS' decision to forego an RCA was not compliant with its own policies and procedures at the time. EXHIBIT 44 (Safety Reporting Matrix); EXHIBIT 45 (SEN – Sept. 21, 2015); EXHIBIT 10 (Lujan Depo.) 16:25 – 17:16 (the Safety Reporting Matrix "specifies when an RCA is required"). CPS' failure to conduct an RCA is very suspicious considering that Mr. Sanchez reported to Richard Lujan that he was diagnosed with PTSD on the same day of the September 21, 2015 Flash Event.

### VII.   CONCLUSION

For these reasons, the Court should deny Defendant's Motion for Summary Judgment [D.E. 39] in its entirety. Plaintiff further requests any other relief to which he may be entitled.

Respectfully submitted,

KATZMAN & KATZMAN, PLLC

Alex Katzman
Texas State Bar No. 00786939
alex@katzmanandkatzman.com

By: */s Justin R. Reyes*

Justin R. Reyes
Texas State Bar No. 24095329
justin@katzmanandkatzman.com

21022 Gathering Oak
San Antonio, Texas  78260
Telephone:  (210) 979-7300
Facsimile:   (210) 979-7357

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been delivered, as designated below, on March 29, 2019.

Christine E. Reinhard
Shannon B. Schmoyer
Delilah Lorenz Evans
SCHMOYER REINHARD LLP
17806 IH 10 West, Suite 400
San Antonio, TX 78257
Phone: (210) 447-8033
Fax: (210) 447-8036
creinhard@sr-llp.com
sschmoyer@sr-llp.com
devans@sr-llp.com

_  Hand Delivery
_  Facsimile Transmission
_  Certified Mail, Return Receipt Requested
_  U.S. Postal Service First Class Mail
X E-service via CM/ECF

**ATTORNEYS FOR DEFENDANT**

   /s/ *Justin R. Reyes*
         Justin R. Reyes