IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

GABRIEL SANCHEZ,                          §
                                          §
          *Plaintiff*,                    §
                                          §
vs.                                       §          SA-18-CV-00184-XR
                                          §
CITY OF SAN ANTONIO, BY AND               §
THROUGH ITS AGENT, CITY PUBLIC            §
SERVICE BOARD OF SAN ANTONIO,             §
                                          §
          *Defendant*.                    §

## ORDER ON MOTION FOR SUMMARY JUDGMENT

On this date, the Court considered Defendant's motion for summary judgment on
Plaintiff's claims under the Family and Medical Leave Act ("FMLA") and the Americans with
Disabilities Act ("ADA") (docket no. 39). In response, Plaintiff has waived his FMLA retaliation
claim and focuses solely on the ADA discrimination claim. In that claim, Plaintiff contends that
Defendant's assertion that he was terminated from his job for safety violations is pretext, and that
he was discriminated against because he has PTSD. After careful consideration, the Court grants
summary judgment.

### Background

Plaintiff Gabriel Sanchez's First Amended Complaint (docket no. 14) is the live pleading.
Therein, Plaintiff asserts claims for disability discrimination and FMLA retaliation. Plaintiff
alleges that he began working for CPS Energy in 2000 and was ultimately promoted to
Journeyman Cable Splicer in February 2014. Plaintiff's direct supervisor was Mike Michalek,
and his next level manager was Richard Lujan, who was supervised by David Luschen.

1

Shortly thereafter, in March 2014, he was injured on the job when he was directed to check a wire for voltage by spiking the cable. The cable turned out to be a high voltage cable, causing a flash and severely injuring Plaintiff. Plaintiff was not written up or disciplined for the incident. Though Lauro Garza (Labor Relations) recommended that Plaintiff be given corrective action, he was voted down by others in the collaborative decisionmaking process. Garza depo. at 48. Plaintiff was out on medical leave from March 27 to May 5, 2014 as a result of his injuries. Plaintiff returned to work on light duty status from May 6 to August 7, 2014. He started to notice that he was becoming more fearful at work, especially when in situations where he had to cut wires.

In 2014, Plaintiff received a 2.45/3.0 rating from his direct supervisor Mike Michalek and his manager, Richard Lujan, which translated to "highly valued" per CPS's performance review. Michalek and Lujan each indicated that Plaintiff "work[ed] very safe" in the December 2014 performance review. Pl. Ex. 5. Plaintiff was given 2/3 stars for safety. *Id.*

In February 2015, Fred Bonewell was hired as the Senior Director of Enterprise Safety. Bonewell depo. at 9. Defendant contends that Bonewell introduced his "actively caring" safety philosophy to CPS in March 2015. He described the philosophy as making sure that employees feel comfortable about their work and who is working with them, and that safety is part of that. Bonewell depo. at 19. He defined the "core" of "actively caring" as "a process of behavior based safety that establishes awareness with employees that they are in control of their safety; that they have the right to refuse to do work if they feel that the work is unsafe; and that they have the ability to provide input on how a work method or a task should be performed to ensure the safety of that work task. It also provides awareness that it's important to provide supervision to the task being performed." Bonewell depo. at 30.

On March 12, 2015, Plaintiff left a propane burner on and unattended at a job site, which caused the pot to boil over and start a fire, burning part of a nearby privacy fence. Plaintiff reported it immediately by phone to his manager, Lujan. Plaintiff depo. at 192-194. Lujan and Luschen visited the site, and Plaintiff explained what had happened. *Id.* at 194-95. Plaintiff stated that they were shorthanded, and he decided to leave the pot, which was not overheated at the time, to assist the apprentices in the manhole because they were asking for help. *Id*. at 195. Plaintiff admitted that it was his responsibility to monitor the pot. *Id.* at 196. However, he felt it was more important as a safety issue to help the apprentices, who were working with hot lead. He testified that he asked someone to watch it, but "he didn't want to." *Id*. at 197. A Safety Event Notification was generated. Def. Ex. 17. Lujan drafted a Reminder 1[1] notice under the CPS Corrective Action Policy the next day, March 13, and emailed it to Luschen and Veronica Zuniga (HR Generalist) for their thoughts. Def. Ex. 21.

Plaintiff alleges that there was a training meeting shortly after where the burner incident was discussed. Plaintiff asserts that many journeymen had "burned a pot" and it was "normal," but others had not been written up. Plaintiff depo. at 199-204. He did not know whether those other incidents involved personal injury or property damage. *Id*. at 206-207. Plaintiff also complains that Lujan stated at the meeting that the incident would be used as a training exercise and no one would be written up over it, but he was then given the Reminder 1. *Id*. at 204-205.

---

[1] "The purpose of a Reminder 1 is to bring a problem, which may include minor performance related concerns, to the employee's attention in a positive but serious manner and to allow the employee the opportunity to give input for developing effective solutions. A Reminder 1 is appropriate corrective action for: A violation of company standards of conduct, policies, safety rules, practices, or performance deficiencies that are minor in nature, does not involve honesty or trust, does not by itself constitute a threat to the operation of the business, and poses no threat to the safety or well-being of employees. An infraction for which training and informal coaching have not been sufficient to bring about change. A Reminder 1 shall be active for a period of six (6) months from the date the corrective action is issued." Def. Ex. 10 (Corrective Action Policy).

On May 1, 2015, Plaintiff received the Reminder 1 in person from Lujan. Def. Ex. 16.[2] The Reminder 1 notice states it was for a non-major safety rule violation, and specifically notes that Plaintiff violated the Rule stating that a burner shall never be left unattended. Plaintiff alleges that Lujan told him that "upper management want me to write you up." Plaintiff depo. at 208-209. Plaintiff did not understand why he was written up a month and a half after the fact, but he did not file a grievance or discuss the Reminder 1 with anyone else and stated that he had no choice but to sign it. *Id.* at 211. Plaintiff signed the Reminder 1 notice with no additional comments. Plaintiff testified that, as of May 1, 2015, he had no knowledge of having been diagnosed by any doctor with PTSD. *Id.* at 213-214.

On May 1, 2015, Plaintiff cut his hand while operating a reciprocating saw. Plaintiff was operating the saw with one hand, and holding the material to be cut in the other hand, and testified that he had never been taught to use two hands when operating the saw. Plaintiff depo. at 217. Plaintiff reported the injury to the other journeymen on the site, who had seniority. *Id.* at 218-19. He stated they were the "lead man" because the foreman was not there, and "[w]e just put a Band-Aid on it, cleaned it up, no problem, kept working." *Id.* at 219. He did not report it to his supervisor.

When Lujan met with Plaintiff to deliver the Reminder 1 for the burner incident that same day, he noticed that Plaintiff had a band-aid on his hand. Lujan believed that Plaintiff was trying to hide the band-aid/injury. Plaintiff admitted that he might have had his hand in his shirt "to cover my hand a little bit, but I wasn't hiding it." Plaintiff depo. at 215-216. When Lujan asked Plaintiff about it, Plaintiff replied "es nada." Plaintiff went home, but Lujan then went to Plaintiff's truck and saw a bloody glove and realized the saw had cut through the work glove,

---

[2] CPS employees testified that it was not unusual for it to take several weeks to issue a Reminder because it has to go through an approval process with HR.

which caused him to think the injury was more serious than Plaintiff had asserted. Plaintiff was called and told to return to work to seek medical attention. *Id*. at 220. Plaintiff and Lujan went to see a nurse, and then to a clinic, where they "put a Band-Aid on it." *Id*. at 221. Plaintiff did not think he did anything wrong with regard to this incident. *Id*. Although policy requires that injuries be reported to a supervisor, Plaintiff was not disciplined because the policy requires a worker to report the injury by the end of the work day, and Plaintiff had done so, though Lujan did not feel Plaintiff did so in a forthcoming manner. CPS contends that Plaintiff's admitted improper use of the saw contributed to preparation of a performance improvement plan ("PIP"). Plaintiff notes that he was not issued a corrective action for the event.

On May 8, 2015, Plaintiff was involved in another incident. Plaintiff was "booming" down in a bucket attached to a CPS Energy work vehicle when he brushed against a streetlight secondary cable, causing an electrical arc. Plaintiff depo. at 224. He testified it was 2 or 3 in the morning and dark and a little windy, and he was nervous and in a "very tight situation" with a primary cable above his head and a secondary cable underneath the bucket. *Id*. He said it would have been better to wait for daylight or until it was less windy, but it was an emergency situation. *Id*. at 225-226. He also testified that he did not get warnings from his spotter. *Id*. at 226. No personal injuries or property damages resulted.

Plaintiff did not report the incident to Michalek or Lujan, which Defendant contends was required. Plaintiff contends he immediately reported the incident to the more senior Journeyman on-site (Randy Brooks), who was his "lead man," and Brooks said he "would take care of" Plaintiff's report. Plaintiff depo. at 227. According to CPS, Brooks reported the incident the following Monday, May 11. Plaintiff asserts that CPS's assertion that Sanchez did not report the event to Michalek is wrong because Michalek testified that he was informed about the event by

Brooks "in the morning." Michalek depo at 55. This answer does not necessarily mean the next morning, however: "Q. Well, do you know for certain that it occurred in a day or days afterwards? A. I know that he told me in the morning." Michalek also testified that he thought it was the next day, but that he did not recall what day it was. Plaintiff also contends that his "report regarding the Bucket Event ultimately made its way to Richard Lujan and Mark Michalek." Docket no. 42-2 at 25. Further, Plaintiff notes that he was not issued a corrective action for the event.

At some point between May 1 and May 8, Lujan met with Bonewell at a breakfast meeting to discuss Plaintiff's safety violations. Bonewell depo. at 23-26. CPS contends this meeting took place on May 6, between the saw and bucket incidents. Docket no. 39-1 at 10. But Plaintiff asserts that Bonewell included the bucket event in the events discussed, meaning that the meeting had to have taken place after the bucket event on May 8. CPS asserts that "[a]lthough discharge was discussed as an option in their meeting as well as over the days that followed, PIP was the option ultimately chosen."

On May 12, Lujan emailed Rick Maldonado, and cc'd Luschen and Michalek as follows:

> Subject: PIP Action Plan
> Rick,
> Below are our proposed recommendations for Randy Brooks and Gabriel Sanchez:
> Randy Brooks
> Issue a coaching memo outlining expectations and summarizing policies for reporting incidents.
> Gabriel Sanchez:
> 1. Implement a Performance Improvement Plan (PIP) for Mr. Sanchez for a period of 6 Months.
> 2. Foreman (or designee) to perform 4 weekly safety audits on Mr. Sanchez. Manager to complete 1 weekly audit.
> 3. Document and track weekly 1-hour coaching sessions with Manager and Foreman.
> 4. Remove Mr. Sanchez from all unsupervised maintenance activities over the duration of this PIP.

5. Provide training to address areas of needed improvement related to safety events and hazard identification (bucket truck operation, using power tools, hazard identifications, other safety related topics).

6. Following successful completion of PIP involve Mr. Sanchez in ongoing UG Department safety teams and initiatives (Safety ambassador, Safety Day training, MEA training evaluation, lead JSAs, other).

Please also see the work plan to develop the PIP attached.

Def. Ex. 27; Pl. Ex. 27 . The PIP would start May 26, 2015 and would remove Plaintiff from call duty and require weekly tracking by Michalek. *Id.* The analysis section of the PIP states, "Mr. Sanchez is demonstrating a pattern of unsafe behavior." *Id.* The background section listed the March 2014 flash incident, the March 12, 2015 burner incident, the May 1 saw/hand injury incident, and the May 8 bucket incident. *Id.*

On May 19, Veronica Uriegas emailed a Critical Issues Activity Report for the week ending May 15 report to Lauro Garza, Zuniga, and others. It states,

Underground‑Gabriel Sanchez (Cable Splicer Trainee)‑management has expressed concern regarding the Safety concerns that have recently developed with Sanchez. Sanchez received a Reminder for Safety and on the same day of issuance, Sanchez told his management that he had cut his finger with Zaw Zaw earlier in the day. Sanchez did not report the incident immediately but did so by end of shift. In addition, there was another incident that was considered operation (near miss) and Sanchez was involved in that incident as well. Management would like to place Sanchez on a PIP for 6 months and or TERM.

Veronica Zuniga testified that she wrote the summary, and that "management" referred to Lujan and Luschen. Zuniga depo. at 171-172.

On May 26, Veronica Uriegas emailed a Critical Issues Activity Report for the week ending May 22. It repeats the language from the earlier report and then states,

UPDATE management drafted the PIP for Zuniga's review. Zuniga reviewed the PIP and asked management to elaborate on the expected changes. Management made changes and re-sent to Zuniga. Zuniga approved the changes and sent it back to management. Pending issuance.

Def. Ex. 28.

Plaintiff notes that a PIP is not corrective action under the Corrective Action Policy. Plaintiff also contends that although Zuniga testified that a PIP is supposed to be reviewed by HR, the proposed PIP was not submitted to HR. There is conflicting evidence, insofar as evidence indicates that Zuniga saw and reviewed the PIP, but Zuniga testified at her deposition that she did not recall receiving the PIP for review, asking management to elaborate, or approving the changes. Zuniga depo. at 173-174.

CPS contends that, in late May, before Lujan could finalize and issue the PIP, Plaintiff reported to him that he was afraid, was having trouble concentrating, and felt he needed help. Plaintiff does not assert a date for this conversation other than it was at some point prior to June 5, but agrees he told Lujan he was afraid, was having trouble concentrating on the job, and felt something was wrong with him, but he did not know what. Plaintiff testified that Lujan said he knew that Plaintiff had PTSD because his father, a police officer, had it and he "knew what that was about." Plaintiff testified that Lujan said that what had happened to Plaintiff (the March 2014 flash event) was "something bad" and "he would have been worse if it had happened to him." Lujan denies speaking with Plaintiff about his father or PTSD, but the Court must assume that he did.

Lujan told Luschen about Plaintiff's expressed fear, and Luschen met with Bonewell, Garza, and Lewis to discuss the issue and next steps. Bonewell depo. at 26-29. According to CPS, Luschen and Garza still suggested the PIP, but Bonewell advocated his "actively caring" safety philosophy, and a collective decision was made to employ an actively caring plan in place of the previously contemplated PIP. Whether characterized as a PIP or an Actively Caring plan, the contours of the plan are mostly undisputed.

It is undisputed that Plaintiff was mandated to attend six counseling sessions at third-party provider Deer Oaks through CPS's Employee Assistance Program ("EAP"). CPS's Corrective Action Policy includes a section on "Mandatory Referral to EAP." It states that management may mandate the employee to an EAP provider for assistance and support when an employee's performance may be negatively impacted by matters personal in nature that could potentially improve with third party intervention. Def. Ex. 10. Plaintiff was also removed from call duty (when employees are called in for emergencies) and placed under foreman supervision while working. These latter two requirements are similar to what was contemplated in the PIP.

There is conflicting testimony about who made what decisions and whether the proposed PIP plan was implemented. Although Plaintiff apparently believed he was placed on a PIP for six months and Bonewell testified that Plaintiff was placed on a PIP (though the components were supervision, removal from call duty, and EAP), CPS says Plaintiff was not on a PIP but on an "actively caring" plan. Bonewell testified that the EAP was mandated by HR, and he was only responsible for the decision to impose supervision on Plaintiff as part of his actively caring plan. Bonewell depo. at 38-42. But Zuniga testified that it was a management decision to send Plaintiff to EAP, specifying Luschen, and stating the decision was "made also with Fred Bonewell." Zuniga depo. at 119-120.

The referral prepared by Zuniga and signed by Michalek dated June 3 states "Management Directive. Mr. Sanchez has been observed having difficulty focusing on his work as a result of his last accident." Lewis testified that she could not recall whose decision it was to mandate EAP but the conclusion was reached at the meeting. Garza testified that he was not involved in the decision to send Plaintiff to EAP. Nevertheless, as noted, there is general agreement that, whether a PIP or "actively caring," Plaintiff was to attend six counseling sessions

(EAP) to provide support for him after he expressed fear of doing his job, and that safety concerns were addressed by removing Plaintiff from call duty and requiring supervised work.

On June 5, 2015, Plaintiff met with Bonewell, Garza, Lujan, Luschen, Michalek, and Zuniga to discuss his placement on EAP, his removal from the call duty rotation, and the requirement that his foreman supervise all his work. Plaintiff testified that they told him they were going to work with him, and they were going to send him to get help at Deer Oaks. Plaintiff depo. at 236-238. Plaintiff testified that he had no objection to being taken off call duty or having to work under a supervisor. *Id.* at 241.

The meeting agenda states that Bonewell and Garza would present/discuss the Actively Caring and Safety Readiness program, and that Luschen would cover "EAP Referral." Def. Ex. 30. Plaintiff attended six counseling sessions with Callie Davis-Carr between June and August 2015. Plaintiff depo. at 243-244. Plaintiff told Davis-Carr that he was excited about serving on a new crew in the summer with younger co-workers who looked up to him. *Id.* at 245. Plaintiff testified that he did work some over the summer without a supervisor watching him, and only one foremen knew about his supervision requirement. He testified that he asked Lujan why all the foreman had not been informed of the requirement so they could watch him, and he would not have to tell them. *Id.* at 251-252, 261. During this conversation, he told Lujan he should be removed from the supervision requirement. *Id.* at 261-62.

According to an Executive Summary prepared by Defendant,

Sanchez completed Deer Oaks sessions on the following dates: June 30, July 7, July 14, July 29, August 4 and August 12. On Thursday, September 17, 2015 at the end of the day, Sanchez had a discussion with Richard Lujan explaining that he was complete with his counseling sessions and felt confident that he was able to perform his duties effectively and ready to return to normal duty (call duty, work without constant supervision). Lujan told him that he would consider his request and discuss with his Director. Sanchez was off the

> following day and returned to work on Monday, September 21 when the
> primary flash occurred.

Def. Ex. 31. Plaintiff does not recall having this conversation, though he does not deny that it happened. Plaintiff depo. at 260-262.

According to Defendant, after Plaintiff informed Lujan that he was done with his EAP counseling sessions and wanted to be returned to call duty, Lujan discussed the issue with Luschen, and CPS agreed to Plaintiff's request. Bonewell confirmed that Plaintiff was released to normal duty in September. Plaintiff believed he was on probation for six months. Plaintiff depo. at 250, 260-261.

There is some dispute about whether Plaintiff worked unsupervised on some occasions over the summer, and about how much overtime he worked. There is no dispute that Plaintiff had no safety incidents over the summer and that Plaintiff completed his counseling sessions (June 30 through August 12), though Plaintiff contends that no one at CPS followed up to see if Plaintiff attended or if they were effective. And there is some dispute about the circumstances under which Plaintiff was to work on September 21, 2015 (whether he was released to full duty).

On September 21, 2015, Plaintiff caused another flash incident that severely injured him. On that day, Plaintiff and his crew were to identify and cut cables in three designated manholes. The foreman was Lonnie Rankin. David Breiten was the apprentice journeyman, and Oscar Gonzales was a civil crew laborer. Plaintiff depo. at 263. The workers went through a Safety Check List, and Plaintiff signed it. *Id.* at 263. They also reviewed a tailboard form with safety reminders and required PPE, including hard hat, flame retardant garments, eye protection, rubber gloves, work gloves, and foot protection. *Id.* at 265-266.[3] Plaintiff marked the cables to be cut in

---

[3] Def. Ex. 32 (Procedure Safety Checklist and Tailboard Meeting form for the job).

all three manholes in red paint. He correctly cut the first two cables, but he cut the wrong cable in the third manhole, causing a flash that severely burned him.

Plaintiff contends that two utility workers were teasing him that morning, which caused him to cut the wrong cable. Plaintiff depo. at 271-73. He testified that when he was coming out of a manhole before cutting any cables, the utility workers "were on the fourth manhole that is not mentioned, and they started making noises like an explosion. Going like that (indicating) to me." *Id*. at 272. He testified that they said "poof" and "Make sure you don't cut the wrong cable and blow up." *Id* Plaintiff testified the he "went to Oscar Gonzales and I told him that these guys didn't know what was going on with me, that if I made a phone call they could get in trouble, to tell them to stop. They [including Oscar Gonzales] laughed, and I left." *Id*. He walked off and did not report it to Rankin. *Id*. at 273. Plaintiff testified he was unaware if Rankin paid attention or not.

Plaintiff testified that while they were in the manholes to mark cables, David Breiten asked why they had to sign a sheet to cut the cables, and Rankin said that, after Plaintiff's accident on March 14, 2014, that they had to sign those papers. *Id*. at 274. Plaintiff "started thinking about" that too, and how "Pat Brown cut the wrong cable a few years back, which he had marked also and – and cut the wrong one anyways. But that's another deal. So I told David that." *Id.*

Before cutting the first cable, Plaintiff signed the Safety Check List and handed it up to Rankin at the top of the hole. Plaintiff was wearing all his PPE, and both Breiten and Rankin were present. After he cut the first cable, he removed some of his PPE, including his face shield, his suit, and primary gloves, thinking the cable was now dead in the other two holes. Plaintiff depo. at 269-270. Thus, even though he would still be cutting two more cables, Plaintiff contends

that he could remove his PPE because those cables would be dead. Plaintiff testified, "I'm wearing what I need to wear." *Id*. at 271.

After he cut the first cable, Plaintiff alleges that Eloy Flores continued to harass him, "talking and saying that to make sure I didn't cut the wrong cable and – and to make sure I didn't blow up. And I was upset when he started say thing. I turned around and I told him that he didn't know what I was going through. . . And as I walked off, he told me to make sure I didn't blow up like last time. And I was upset. We went into the next manhole, and I told David [Breiten] that the guys were messing with me, and I was – I was very upset. I was just thinking about my previous accident. But I had to keep going to do my – whatever I had to do. And I came out the second manhole and went on to the third manhole. . . . When I told David that the guys were messing with me, he told me to – to you know, try to calm down and don't listen to them." Plaintiff depo. at 275-76. Thus, Breiten accompanied Plaintiff to perform the second cut, but Plaintiff did not verify whether Rankin was up top at the second cut. Plaintiff correctly cut the cable in the second manhole.

Plaintiff then went to the third manhole and cut the wrong cable in the third manhole, causing a flash. Plaintiff did not wait for the apprentice Breiten or for the foreman to be present before cutting the third cable. He did not verify that supervisor Rankin was in the area at the top of the manhole, and Breiten was not with him. Plaintiff testified, "I didn't look for Rankin. I was upset. I was – I wasn't thinking about Rankin. I wasn't thinking about Breiten." Plaintiff's depo. at 281.

When asked why he didn't "stop the job" as he was permitted and instructed to do if something seemed unsafe, he said, "I wasn't thinking about nothing else. I was thinking about my previous accident." *Id*. He also said, "I couldn't stop," and when asked why not, he said, "I

don't know. I don't control that. I couldn't stop. My – my mind as going everywhere." *Id.* at 283. He also testified that Rankin was supposed to be right behind him, and admitted that, "in the perfect world," he was supposed to wait for Rankin, but stated, "when they've been taunting you and your head's not straight, what can you do?" *Id.* at 285. When asked, "You can stop the job, can't you?" he answered, "If you're not thinking about stopping the job, ma'am, you're thinking about doing your task and working, but you're upset with what they're telling you and your mind is – is going different directions." *Id.* He testified that he would have been fine if they had not "been messing with me." *Id* at 286. Thus, Plaintiff contends, he cut the wrong cable "as a result of the harassment" and because Rankin did not properly supervise him insofar as he only supervised Plaintiff from above on the first manhole, and not on the second or third. Docket no. 42-2 at 47-48.

Plaintiff called Lujan immediately after the event and told Lujan he had cut the wrong cable. Plaintiff depo. at 287; Lujan Decl. ¶ 11. He did not mention the teasing at that time. Plaintiff was taken to the hospital for treatment, where in addition to treating his burns, Plaintiff underwent a psychological evaluation and was diagnosed with PTSD.

After the incident, all work at the site was stopped and all present were directed to complete handwritten "eyewitness" statements.[4] The employees were then interviewed individually by Lujan and Labor Crew Manager Tony Gonzalez and witnessed by foreman Jimmy Alonso.[5] Lujan typed up the statements and the employees signed them. However, no one reported teasing or harassment in their statements or during the interviews, including the two

---

[4] Def. Ex. 35: Lonnie Rankin (foreman) eyewitness statement ("normal work and practice prior to event"); David Breiten (apprentice) eyewitness statement; Roderick Herring (trainee) eyewitness statement; Eloy Flores (utility worker) eyewitness statement; Oscar Gonzales (truck driver) eyewitness statement; David Carvajal (cable installer) eyewitness statement; Lorenzo Ortega (utility worker) eyewitness statement.

[5] Def. Ex. 35: Interview notes: Jay Maddox, Dan Carvajal, David Gutierrez, Oscar Gonzales, Roderick Herring, Eloy Flores, Lorenzo Ortega. David Breiten, Lonnie Rankin.

utility workers and the supervisor that Plaintiff says he complained to, and including Breiten. They reported nothing out of the ordinary with the crew or with Sanchez.

Lujan visited Plaintiff in the hospital that evening, where Plaintiff told him of the teasing/harassment at the job site and of his PTSD diagnosis. Plaintiff depo. at 288 (Plaintiff told Lujan at 10:30 at night at BAMC). Plaintiff did not recall Lujan's response. *Id*. at 289. Lujan states he was upset by this information and immediately reported the information to Luschen by phone. Lujan Decl. ¶ 14. The next day, Lujan and Tony Gonzalez interviewed the utility workers identified by Plaintiff, including Eloy Flores, and his foreman Oscar Gonzalez, and both denied that any teasing had occurred. Lujan did not obtain any additional written statements because there was "nothing to add." Lujan at 85-86; Lujan Decl. ¶ 15. Lujan reviewed the prior witness statements and confirmed no one noticed anything suggesting Plaintiff was upset or had mentioned any teasing. Lujan Decl. ¶ 15. Lujan reported to Luschen that Plaintiff's allegations were not substantiated. Lujan depo. at 100-101; Luschen depo. at 96-98. Plaintiff asserts that the teasing falls within CPS Energy's anti-harassment policy and that Lujan was required to report it to the Employee Relations team, but there is no evidence that he did. Plaintiff also complains about the different investigation quality into the event itself and the allegations of teasing/harassment, and the lack of any documentation concerning the teasing investigation.

On September 22, CPS issued a "Quality Assurance Event Investigation Form" signed by Maldonado that included a section on "containment" (*i.e.*, "what was done to 'stop the harm' and prevent the event from spreading") stating, "Effectively immediately, Foremen will physically verify that all identification marks are made by the Journeyman prior to cutting any cable. Foreman will stand on top of each manhole or vault prior to each cable cut and confirm that all proper PPE is worn prior to cutting." Def. Ex. 36; Pl. Ex. 32. Lujan testified he was not sure if

the policy was new but "if it didn't make it new, it reaffirmed the requirements." Lujan depo. at 94-95. CPS contends that, during the investigation, it learned that it was not clear to all that the foreman needed to verify physically the correct cables were identified and remain on top of the manhole when a cut was performed, and thus Maldonado "reiterated and mandated the process to be followed going forward." A Safety Event Notification was also generated by Lujan, R. Wolff, and others that listed the "behavioral cause" as "eyes on task." Def. Ex. 33.

On September 26, 2015, Dr. Hernandez at Texas MedClinic saw Plaintiff for an initial visit as his treating physician and filled out a Work Status Report releasing Plaintiff to work from September 26, 2015 to October 9, 2015, with the restrictions of no work in extreme hot or cold environments, no work on heights/scaffolding, limit work to a climate-controlled environment, and no direct handling of high voltage items until further notice. Def. Ex. 38, 39. The "work injury diagnosis" states burn, corneal abrasion, arc flash, PTSD. *Id.* It also noted a referral to "[opth]almologist and Psych." *Id.* The leave department (Lisa Jarzombek) sent the following email, "Received DWC-73 on Gabriel Sanchez. He has been placed on light duty status effective 9/25/15 through 10/9/15. His next follow up appointment is scheduled for 10/9/15. He has several referrals pending." Def. Ex. 39. James Williams, PAC, from the burn clinic also prepared a Work Status Report on September 26, releasing Plaintiff to work from September 26, 2015 through September 26, 2016 with the following restrictions: "must have ophthalmology, behavioral medicine clearance – must wear SPF 50 sun block x at least 1 year." Def. Ex. 40.

On September 28, Defendant began preparing a light duty accommodation to accommodate the restrictions on hot/cold environments and no heights/scaffolding ("Gabriel will go to Green Mountain to work . . . on light duty."). Def. Ex. 39. Plaintiff was given a Bona Fide Offer of Employment for light duty in scheduling/administration at Green Mountain at the same

pay. The offer included the following language: "Description of modifications of this assignment: May not work in extreme hot/cold environments, at heights or on scaffolding, limit work to a climate controlled environment, and no direct handling of high voltage items until further notice." Def. Ex. 39.

However, Defendant asserts that it learned after a conversation with Plaintiff that two other physicians (the ophthalmologist and psychologist) had not released Plaintiff to work, so Plaintiff continued to remain out of work on FMLA leave. Docket no. 39 App'x A at 20; Def. Ex. 40. On December 14, 2015, Plaintiff was notified that he had exhausted his job protected leave under the FMLA, state leave laws, and/or company leave policies. Def. Ex. 41. The letter instructed Plaintiff to contact CPS Energy Leave Administration as soon as possible to discuss his return to work date or to discuss options if he was not able to return to work at that time. However, as of December 14, Plaintiff was told, "you will no longer have a job protected leave of absence." Plaintiff was still unable to return to work, so he remained out on medical leave pursuant to Defendant's medical leave policy, which provided up to 13 months of cumulative leave.

Plaintiff was given a score of 1.9/3.0 on his December 2015 performance review. Although this score placed him in the "highly valued" category, there are only three categories, and any score lower than 1.75 was the bottom category of "less effective." Pl. Ex. 6.[6] Plaintiff was given 1/3 stars ("less effective") for safety. *Id.* Plaintiff's direct supervisor Mike Michalek wrote the following comment, "Gabriel displayed unsafe acts or created unsafe conditions where actions contributed to an injury or preventable accident/incident; or demonstrated a pattern of unsafe acts resulting in injury, damage or harm to themselves, peers or the public." *Id.*

---

[6] The ranges were: 2.70 to 3.00 - Top Performer; 1.75 to 2.69 - Highly Valued; 1.00 to 1.74 - Less Effective.
A PIP was required if the overall score fell in the "less effective" range. Pl. Ex. 6.

On January 25, 2016, Dr. Hernandez prepared a Work Status Report stating that Plaintiff's PTSD prevented him from returning to work as of that date and was expected to continue until March 7, 2016. Def. Ex. 44. Plaintiff was scheduled for re-evaluation on March 7. On January 26, Lisa Jarzombek of the leave department emailed Lujan, Michalek, Zuniga, Amy Navarro (Manager, Integrated Absence Management) and others, "Received DWC-73 on Gabriel Sanchez. He remains off work through 3/7/2016. His next follow up visit is scheduled for 3/7/2016." Pl. Ex. 38. The Work Status Report was attached to the email. Lujan forwarded it to Zuniga stating, "FYI. See Part 2 in the section stating what prevents him from returning to work," referring to the note that PTSD prevented Plaintiff from returning to work. *Id.* Amy Navarro, the Manager of Integrated Absence Management, wrote, "Which Dr. is this keeping him off work? I thought he was released by all Dr. except the psychiatrist?" *Id.* Jarzombek responded, "His treating doctor at the Texas MedClinic. He is relating placing him off work due to PTSD." *Id.*

In February 2016,[7] Plaintiff spoke with Zuniga in HR on the phone and discussed returning to work. Plaintiff depo. at 296.  Plaintiff testified that he told Zuniga that his "therapy doctor" (Dr. McMains) wanted him to go back to work to see how he would do. *Id.* at 296-98. Plaintiff testified that this was the first time that Dr. McMains felt that he was ready to go back to work in some capacity, and that he was to go back as a journeyman without restrictions. *Id.* at 297-298. Zuniga testified that Plaintiff informed her he would be returning to work soon, but did not say how soon or give a date. Zuniga depo. at 154. Zuniga testified that Plaintiff "shared that he didn't feel he would be able to return to his regular duties." *Id.* at 154-155. Zuniga testified that Plaintiff told her one of his doctors recommended to him that he should go back to work,

---

[7] The EEOC charge and Complaint allege the conversation took place on or about February 18, but Zuniga's notes from the call are dated February 1.

and she also testified that he said he still had a doctor's visit. *Id*. at 157. She testified that she reported this to management, including Garza. *Id*. at 155-156.

Plaintiff testified that Zuniga said that "everything was going to be okay, that my job was there waiting for me." Plaintiff depo. at 297. Zuniga denies saying this. Zuniga depo. at 158. Zuniga testified that they did not discuss whether Plaintiff could perform his job with accommodations. *Id*. at 155. Zuniga's call notes include the following, "Touch bases. Am I going to have a job? released to full duty in the next month or so"; "seek another position"; "change jobs. doing better, more relaxed"; "phy[sician] – see me in another month"; "go back to same job might have same reaction." Def. Ex. 45; Zuniga depo. at 160-161. Zuniga testified that she wrote down what Plaintiff was communicating to her. Zuniga depo. at 161. After hearing that Plaintiff anticipated returning to work, CPS Energy began the process of determining what action to take.[8]

On February 15, Jarzombek wrote an email that Plaintiff had used 275 days of his 13-month leave and would need his "9 month letter sent out." Pl. Ex. 43. Thus, Plaintiff would exhaust his leave under CPS Energy's medical leave policy in another four months, in June 2016.[9]

---

[8] Lisa Lewis testified that she heard from Lauro Garza that Plaintiff was intending to return from his leave, specifically that Garza mentioned that Plaintiff was potentially going to return to work and they discussed the fact that the September 2015 flash incident was still outstanding and "we had a conversation about having a discussion with the Business Unit about next steps." Lewis depo. at 40.

[9] CPS Energy acknowledges its policy to provide 13 months of medical leave, but notes this is cumulative, and thus Plaintiff had only eight months remaining on this leave at the time of his September 21, 2015 flash incident. Thus, CPS Energy states Plaintiff would have been out of medical leave (either as leave or modified duty) in May or June 2016.

On February 23, 2016, CPS senior leadership held a meeting, and Defendant contends they made the decision to terminate Plaintiff at the meeting.[10] Plaintiff asserts that Defendant has provided conflicting evidence as to who made the decision to terminate Plaintiff. Docket no. 42 at 16. However, it appears clear that Paul Barham (Vice President of Energy Delivery Services), Fred Bonewell (Vice President of Employee and Public Safety), Lisa Lewis (Vice President of People and Culture), and Rick Maldonado (Senior Director of EDS Construction and Maintenance) were present and were decisionmakers. The testimony is less clear whether Lauro Garza or David Luschen attended the meeting, but the deposition testimony indicates that they provided input into the termination decision.

CPS Energy witnesses all testified that there was no mention made at the meeting about Plaintiff's PTSD diagnosis, his symptoms, or his referral to EAP. Bonewell depo. at 96, 107, 113; Lewis depo. at 26, 29-30; Garza depo. at 86, 140; Luschen depo. at 78, 82. Lewis, Bonewell, and Garza also testified that they were unaware of the complaint of teasing/harassment preceding the incident. At the end of the meeting, it was collaboratively decided that discharge was warranted, though apparently the decisionmakers focused on different incidents as bases for their decisions. Fred Bonewell and Lisa Lewis both testified that their decision was based solely on Plaintiff's behavior in relation to the September 21, 2015 event, while Luschen and Garza testified that they based their decision on all of the 2015 incidents. No testimony or affidavits have been provided from Barham or Maldonado. Luschen then put together a termination letter.

---

[10] Defendant's Exhibit 31 is an Action Plan for Sanchez regarding the plan for termination, and includes an Executive Summary dated September 23, 2015 listing various safety events involving Plaintiff, including events in 2007 and 2008, the March 27, 2014 flash event, the March 12, 2015 event, the May 1, 2015 injury, the May 2015 bucket event, and the September 21, 2015 flash event. Def. Ex. 31. It is unclear what role this plan played in the February 23 termination meeting.

Plaintiff was not released by Dr. Hernandez to return to work on March 7, although the record does not indicate why. Plaintiff depo. at 299. There is no indication that Plaintiff contacted anyone on March 7 about returning to work or that any updated Work Status Report was prepared on March 7. Thus, on March 8, Plaintiff had not been released to work.

Plaintiff's employment was terminated on March 8, 2016 in a telephone call placed to Plaintiff by Luschen, Lujan, Michalek, and two HR generalists. Luschen read the contents of the termination letter. Plaintiff was mailed the letter, which stated he was being terminated because his performance "exhibits a pattern of poor judgment, unsafe acts and behavior and unwillingness to follow critical work instructions." Def. Ex. 5. The letter further stated, "Despite efforts to correct these issues, your conduct has resulted in serious harm to yourself and substantial risk to others. You[r] unacceptable and continued disregard for safe work practices behavior is a terminable offense under the Corrective Action Policy." *Id.*

Dr. Hernandez prepared another Work Status Report on March 21, 2015 after a visit that day. Def. Ex. 47. It stated Plaintiff could return to work March 21, 2016 to May 23, 2016 with the following restrictions: no work at heights or on scaffolding. Def. ex. 47.

On March 22, Plaintiff filed a grievance with CPS related to his termination. Plaintiff depo. at 319-320. He stated that he wanted his job back, but did not mention anything about thinking he was terminated because he had PTSD. Plaintiff depo. at 320. Plaintiff did not agree to have his medical information discussed at the grievance hearing. Plaintiff depo. at 320-321. It appears that grievance remains pending or unresolved. It is unclear, but it appears that Plaintiff is asserting that he was able to go back to work on March 21 with no accommodations other than no heights or on scaffolding.

Dr. McMains was the psychologist treating Plaintiff at the Pain and Recovery Clinic of San Antonio. His May 19, 2016 notes state that Plaintiff was evaluated October 13, 2015, with a follow-up evaluation on January 7, 2016 and a final evaluation on May 19, 2016. In the history of present illness, Dr. McMains reports that "[Plaintiff] doubts his ability to do his job." In the "current level of functioning" section, Dr. McMains wrote, "Mr. Sanchez reports having tried to do electrical work since he completed therapy. He had to do it in association with his brother's business since his prior employer had let him go. He reported 'getting very nervous and afraid almost to the point of panic.'" Dr. McMains noted that Plaintiff's "emotional status seemed to have deteriorated after his on the job accident and improved after the first round of IPT [individual psychotherapy] that included EMDR. However, after losing his job and trying to do some routine electrical work, he appears to have again developed symptoms of depression and anxiety." He further noted that his "PSEQ score suggests depression and difficulty returning to his original employment." Testing results showed severe anxiety and depression on October 13, 2015, mild anxiety and moderate depression on January 7,2016, and severe anxiety and depression on May 19, 2016.

Last, in the "summary and recommendations," Dr. McMains wrote, "Therapy appears to have helped him deal with the anxiety associated with the trauma he experienced, initially. After losing his job and trying some electrical work, he seems to have had a reoccurrence of symptoms of anxiety and depression, even though he was on medication and had actively participated in therapy. . . . Given the apparent reoccurrence of his symptoms, it is appropriate that he be followed for treatment. In addition, a referral to DARS for a vocational evaluation and job retraining is recommended. Being gainfully employed again is likely to relieve a good deal of Mr. Sanchez's depression and anxiety. As for his abilities to return to work, it is recommended

that he return to full time employment but in a job that is not related to electrical work. The anxiety he experiences when working on electrical jobs interferes with his ability to concentrate on the job, making it difficult for him to work efficiently. However, he reports being able to do other construction tasks like paining without anxiety."

Plaintiff had a follow-up visit with Dr. Hernandez, his treating physician on June 20, 2016. After the visit, Dr. Hernandez signed a Work Status Report releasing Plaintiff to return to work as of June 20, 2016 through July 11, 2016, with the following restrictions: no work at heights or on scaffolding and "no work with electricity." Def. Reply Ex. 2.

Plaintiff complains that a Root Cause Analysis was required but not conducted for the September 2015 flash event. He notes that Luschen was instructed by his supervisor Maldonado to start the RCA, and he secured the scene and took pictures, but was unaware as to why the RCA did not occur. Docket no. 42-2 at 56-58. The record contains a July 1, 2016 letter from Carolyn Shellman, Executive Vice President and General Counsel of CPS, which states, "CPS did not perform a Root Cause Analysis on the September 21, 2016 incident. However, we reviewed the facts surrounding the incident and provide the following assessment: The flash would not have occurred in Gabriel Sanchez had followed CPS Energy's procedures; and the injuries sustained by Mr. Gabriel would have been minimal, if sustained at all, if he would have worn the required protective gear." Def. Ex. 49.

Plaintiff filed a charge with the EEOC in January 2017, alleging a failure to accommodate as it had for others injured on the job and discrimination and retaliation against him because of his disability. Def. Ex. 50. In its position statement, CPS submitted the following explanation for the termination: "Throughout the approximately twelve years Sanchez trained to become a Cable Splicer, he received numerous detailed instructions and trainings on the

protocols he was to follow in addition to the proper protective equipment to be worn. Despite these trainings and CPS Energy's efforts to assist Sanchez in performing his duties responsibly and properly, Sanchez exhibited a pattern of poor judgment and unsafe behavior in 2015. He also demonstrated an inability to follow critical work instructions and safe work practices. As a result of multiple incidents that occurred in 2015, CPS Energy terminated Sanchez's employment under its Corrective Action Policy on March 8, 2016." Pl. Ex. 14. It further stated that his performance prior to 2015 was irrelevant, and "it was a series of incidents in 2015 that led to his termination of employment." *Id.* CPS noted the March 12, 2015 burner incident, the May 1 saw incident (noting that Plaintiff attempted to hide the severity of the cut), the bucket incident, and the September 21, 2015 incident. *Id.*

Plaintiff alleges in Count One that Defendant CPS had knowledge of Plaintiff's disability (PTSD) and/or regarded Plaintiff as being disabled, and terminated his employment because of his disability and/or Defendant's perception of Plaintiff's disability, in violation of the ADA/ADAAA. Plaintiff alleges in Count Two that his PTSD was a serious health condition under the FMLA for which he was entitled to medical leave, and that Defendant terminated his employment for seeking designation and/or leave under the FMLA, and/or for the time he was forced to take off work to care for his serious medical condition.

Defendant moves for summary judgment on the following grounds: (1) Sanchez's FMLA claim fails because he admitted in his deposition that he did not believe his discharge was related to his FMLA leave and he cannot establish pretext; (2) Sanchez fails to establish a *prima facie* case of disability discrimination because he was not qualified for his position at the time of his discharge; and (3) Sanchez cannot causally connect his March 2016 discharge to an actual or

perceived disability or establish pretext. In his response, Plaintiff concedes his FMLA claim, and thus only the second two issues related to the ADA claim remain.

## Summary Judgment Standard

Summary judgment is proper when the evidence shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgement as a matter of law." FED. R. CIV. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-52 (1986). A dispute of a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson*, 477 U.S. at 248. Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails . . . to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Curtis v. Anthony*, 710 F.3d 587, 594 (5th Cir. 2013) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

The Court must draw reasonable inferences and construe evidence in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Although the evidence is viewed in the light most favorable to the nonmoving party, a nonmovant may not rely on "conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence" to create a genuine issue of material fact sufficient to survive summary judgment. *Freeman v. Tex. Dep't of Criminal Justice*, 369 F.3d 853, 860 (5th Cir. 2004). The court "may not make credibility determinations or weigh evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 120 (2000); *Anderson*, 477 U.S. at 254-55.

**Disability Discrimination under the ADA**

Plaintiff asserts two claims under the ADA: (1) that he was discriminated against because Defendant regarded him as disabled and (2) he was discriminated against because he was actually disabled. Defendant contends that Plaintiff cannot satisfy his *prima facie* burden for either claim because he was not qualified for his position at the time of his discharge and that even if he establishes a *prima facie* case, he fails to causally connect his discharge to his actual or perceived disability.

A. *Prima facie case*

In order to make out a *prima facie* showing under the *McDonnell Douglas* framework for the claim that he was discriminated against because he was actually disabled or regarded as disabled, Sanchez must show that: (1) he was actually disabled or he was regarded as disabled (as described in 42 U.S.C. § 12102(3)); (2) he was qualified for the job; and (3) he was subject to an adverse employment decision on account of the disability or perception of disability. *Cannon v. Jacobs Field Servs., N.A. Inc.*, 813 F.3d 586, 590 (5th Cir. 2016); 42 U.S.C. § 12102(1). CPS Energy asserts that it does not dispute the first element for purposes of this motion because Plaintiff's PTSD may qualify him as actually disabled. Nor does it dispute that termination is an adverse action under the ADA. CPS Energy challenges the second element of the *prima facie* case – whether Sanchez was qualified for his job at the time of his termination.

A plaintiff can establish that he is "qualified" by showing that "either (1) [he] could perform the essential functions of the job in spite of [his] disability," or "(2) that a reasonable accommodation of [his] disability would have enabled [him] to perform the essential functions of the job." *Moss v. Harris Cty. Constable Precinct One*, 851 F.3d 413, 418 (5th Cir. 2017). "Time off, whether paid or unpaid, can be a reasonable accommodation, but an employer is not required

to provide a disabled employee with indefinite leave." *Id.* Further, reassignment to a different job may be a reasonable accommodation, but the plaintiff bears the burden of proving that an available position exists that he was qualified for and could, with reasonable accommodations, perform. *Id.*

Plaintiff did not return to work in any capacity from September 21, 2015 through the date of his termination on March 8, 2016. Plaintiff depo. at 293. Plaintiff testified that he did not ever speak to anyone with CPS Energy about needing more time out of work, other than a conversation in December 2015 with Jose Castaneda (a nurse), who said "don't worry about it" during a visit to Plaintiff's home. Plaintiff depo. at 303. However, it appears undisputed that Plaintiff was being given medical leave under CPS Energy's medical leave policy, and that would not expire until May or June 2016. Pl Ex. 42, 43.[11] Plaintiff also testified that he did not speak with anyone about needing to change any of his job duties or some sort of accommodation in order to return to work. Plaintiff depo. at 304-305.

CPS contends that Sanchez was not qualified since he was not released to return to work on March 8 and other evidence indicates that he would not have been able to return to full duty, and he requested no light duty accommodations. In its motion, CPS points to the following: (1) Plaintiff was not released to work in any capacity on March 8, the day of his termination; and (2) Plaintiff's treating psychologist Dr. McMains' May 19, 2016 medical evaluation states that "it is

---

[11] That policy states, "CPS energy may allow up to 13 cumulative months of medical leave due to an employee's medically verifiable on or off-the-job injury or illness." Pl. Ex. 42. Further, "Medical leave will run concurrently with any other applicable leaves of absence so that the maximum duration of absence available from CPS Energy due to an employee's injury or illness will be 13 cumulative months within 36 months beginning with the initial date of the medical leave." *Id.* The policy also states that CPS will review requests for extensions of leave to determine if such should be granted as a reasonable accommodation under the ADA, but that requests that "pose an undue hardship or are indefinite in nature generally will not be granted" and that "[a]n employee unable to return to work with or without a reasonable accommodation will be separated from employment." *Id.*

recommended that [Sanchez] return to full time employment but in a job that is not related to electrical work." Def. Ex. 48 at 4.

Plaintiff contends that there is no evidence that rendered him medically incapable of performing his job duties on March 8, 2016, and instead: (1) Plaintiff testified at this deposition in November 2018 that he is fully capable of performing work as a cable splicer, that his PTSD does not affect his ability to work as a cable splicer, and that his PTSD does not affect his ability to work in any way. Sanchez depo. at 84-85.[12] (2) Dr. McMains' "recommendation" was only a recommendation, and did not render him incapable of performing his duties, and it was issued three months after the decision to terminate and two months after Sanchez was notified of his termination; (3) although he exhausted his FMLA leave, he was well within the 13-month leave afforded him under CPS Energy's medical leave policy; and (4) CPS was aware that Sanchez was set to return to work after March 7, the day before his termination, and thus his leave was not indefinite.

Plaintiff further contends that the evidence demonstrates that he was a well-qualified Journeyman Cable Splicer and that he received a rating of "highly valued" on his 2015 performance appraisal despite his alleged poor judgment during that time. However, as noted, his overall score was close to the bottom level of "less effective," which would have required a PIP, and his safety score was "less effective." Further, the fact that a plaintiff has held a job for a long period of time or was qualified at an earlier point in time does not establish qualification for

---

[12] Plaintiff testified at his deposition that he does not consider himself disabled now but that the doctors say he is, and he still goes to the doctor for medicine. Plaintiff depo. at 112-113. He states that medication helps a lot to control his symptoms. Plaintiff depo. at 113.

purposes of the ADA claim; the question is whether he was qualified at the time of his termination. *Moss*, 851 F.3d at 418. [13]

Although Plaintiff has not articulately argued that he needed or was denied a reasonable accommodation, he did assert a failure to accommodate in his EEOC charge, and it appears that he contends that he should have been granted additional leave until he received medical clearance.[14] He notes that CPS Energy believed that Plaintiff intended to return to work soon at the time of his termination on March 8, 2016. He also asserts that the March 21, 2016 Work Status Report stating he would be allowed to return to work on March 21 is evidence that he was qualified to work on the date of his termination and his leave was not indefinite, whether it was set to end on March 7, 2016 or March 21, 2016. Defendant replies that there is no evidence that Plaintiff could return to work as of March 8, 2016 with a reasonable accommodation, be it through additional leave, modified duty, or placement in another job, and the available medical evidence indicates that Plaintiff could not have returned to work given the restrictions on working with electricity. The Court agrees with Defendant.

Plaintiff must show that, at the time of his termination, he could perform the essential functions of his job or that a reasonable accommodation of his disability would have enabled him to perform the essential functions of the job. *Moss*, 851 F.3d at 417.[15] There is no dispute that

---

[13] Plaintiff also notes that, on May 28, 2015, he received a letter from CPS stating, "On behalf of CPS Energy, I want to express my tremendous gratitude to you for the endless hours of service you dedicated restoring power during the Memorial Day weekend storms. While taking time away from your family is always difficult, your commitment to our community is unparalleled and to be admired. Your dedication has not gone without notice, and we truly belief that you have played an integral role in the success of CPS Energy." Pl. Ex. 9. It further stated, "Please accept our thanks and gratitude for being such a valuable employee." *Id*. Plaintiff also notes that he received two pay increases during his time as a Journeyman Cable Splicer. However, this evidence is not particularly relevant to whether Plaintiff was qualified at the time of his termination in March 2016.

[14] There is no mention of failure to accommodate in Plaintiff's Complaint.

[15] The evidence is that Plaintiff intended to return to his job as Journeyman Cable Splicer. Plaintiff does not argue or provide evidence that he requested any reasonable accommodations to be able to return to that job or another job at CPS.

working with electricity is an essential function of Plaintiff's job as Journeyman Cable Splicer. Plaintiff had not been released to return to work on March 8, and thus must show that CPS failed to reasonably accommodate him. Because he requested no specific job accommodation, the only possible accommodation at issue here is continued leave until he was medically cleared to return to his job as Journeyman Cable Splicer.

Plaintiff contends that he intended to return to full duty work, but he does not show any work release to that effect, and there is no indication he informed anyone at CPS that he would actually be reporting back to work on March 8 or any other specific date. The March 21, 2016 work release from Dr. Hernandez still requires no heights/scaffolding, and Plaintiff has not shown that he could perform his job with these limitations or as a reasonable accommodation. Even assuming so, however, Plaintiff has not shown that Dr. Hernandez's March 21, 2015 work release is the "behavior medicine clearance" that was required for him to return to work before September 2016. Plaintiff's testimony is that Dr. McMains *intended* to release him to full duty to see how he would do, but there is no evidence that Dr. McMains ever did so. The only evidence is that, in May 2016, Dr. McMains recommended that Plaintiff return to full time work, but not with electricity. His report indicates that Plaintiff doubted his ability to do his job and states that when Plaintiff attempted to "do electrical work . . . in association with his brother's business," he "reported 'getting very nervous and afraid almost to the point of panic.'" Dr. McMains noted that his "PSEQ score suggests depression and difficulty returning to his original employment."

Further, Dr. Hernandez also issued a Work Status Report in June stating "no work with electricity." Thus, the medical evidence indicates that Plaintiff was not qualified to perform the duties of his Cable Splicer job. *See Reed v. Petroleum Helicopters, Inc.*, 218 F.3d 477, 480 (5th Cir. 2000) (plaintiff not qualified where medical evidence showed she was medically unable to

perform the duties of her job on June 2, the day she was terminated, and no such inference was allowable given that her physician also stated that she could not work on June 14, June 20, and July 5).

Plaintiff has not shown a release to full duty in March 2016 or thereafter, and even if CPS Energy was required to maintain Plaintiff on medical leave through June 2016 or thereafter, Plaintiff has not shown that he would have been capable of returning to full duty at that time.[16] The Court thus finds that the evidence conclusively shows that Plaintiff was not fully released to work to his former position as Journeyman Cable Splicer on March 8, 2016, and Plaintiff has failed to raise a fact issue as to whether he would have been able to return to his job at some definite time if given further leave as an accommodation.

B. *Pretext/Causation*

Even if Plaintiff has raised a fact issue as to whether he was qualified, the Court finds that he has failed to produce evidence that, taken as a whole, creates a fact issue as to whether he was terminated because of his actual or perceived disability.

If the plaintiff successfully establishes a *prima facie* case, the burden shifts to the employer to produce evidence that the adverse employment action was taken for a legitimate, nondiscriminatory reason. *Cannon*, 813 F.3d at 590. If the employer meets this burden, then the burden shifts back to the plaintiff to establish that the reason provided by the employer is a pretext for discrimination. *Id*. In the summary-judgment context, the question is not whether the plaintiff proves pretext, but whether the plaintiff raises a genuine issue of fact regarding pretext. *Caldwell v. KHOU-TV*, 850 F.3d 237, 242 (5th Cir. 2017). To overcome a legitimate, nondiscriminatory reason for termination, the plaintiff must show something beyond

---

[16] The Court notes that Plaintiff's damages expert Coffey has not included electrical work as possible work for Plaintiff because Plaintiff is no longer "interested" in such work because of his fear of working around electricity and due to Dr. McMains' recommendation.

disagreement with the employer's decision. *Wittmer v. Phillips 66 Co.*, 915 F.3d 328, 332 (5th Cir. 2019).

Pretext may be established through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence. Plaintiff does not provide any evidence of disparate treatment, so he must show that the proffered explanation for his termination is false or unworthy of credence. *Outley v. Luke & Assocs., Inc.*, 840 F.3d 212, 218 (5th Cir. 2016). Further, to carry his burden of showing pretext, Plaintiff must rebut each nondiscriminatory reason articulated by the employer. *McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007). A plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated, even without further evidence of defendant's true motive. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 148 (2000); *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003). The Fifth Circuit applies a "motivating factor" test, which provides that discrimination need not be the sole reason for the adverse employment decision, so long as it actually plays a role in the employer's decision making and has a determinative influence on the outcome. *Delaval v. PTech Drilling Tubulars, LLC*, 824 F.3d 46, 480 (5th Cir. 2016).

As noted, Defendant's asserted legitimate, nondiscriminatory reason for Plaintiff's termination is that he was discharged because of his "pattern of safety violations that exhibited poor judgment and a continued failure to follow critical work instructions." Docket no. 39 at 11. Plaintiff attempts to show pretext and causation by showing inconsistencies in Defendant's asserted reason and by showing that Defendant failed to follow its established policies. Plaintiff disputes the validity of the assertion that a "pattern" of violations existed and that it was the

actual basis for Defendant's decision because deposition testimony shows that the decision to terminate was based on only the September 2015 flash incident. Plaintiff further asserts that "Actively Caring" is not an actual CPS policy, that no one but Plaintiff had been put on "Actively Caring," and that this was done after Defendant learned that Plaintiff suffered from the symptoms of PTSD (fear). Plaintiff also contends that the decisionmakers either knew of Plaintiff's expressed fear or of his PTSD and discussed PTSD with regard to Plaintiff's viability to work during the February 23 meeting at which the termination decision was made, citing the testimony of Fred Bonewell that he learned about PTSD from Lauro Garza during a "collaborative meeting with respect to determining Mr. Sanchez's viability to work at CPS" at which "Garza explained to [Bonewell] what PTSD is." Bonewell depo. at 67.

Plaintiff further attempts to cast doubt on Defendant's proffered justification by pointing out conflicting testimony about who were the final decisionmakers and/or had input into the termination decision, conflicting testimony about who attended the February 23, 2016 meeting at which the termination decision was made, Lujan and Luschen's alleged failure to report Plaintiff's allegation of harassment/teasing on September 21, 2015 to HR and the lack of documentation of Lujan's investigation into the allegation, the failure to create a Safety Event Notification for the May 1 and May 8 incidents, and the failure to conduct a Root Cause Analysis of the September 21, 2015 event.

Plaintiff asserts that he may establish pretext by showing that Defendant has provided inconsistent or conflicting explanations for its conduct, or by showing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Defendant's proffered reasons such that a reasonable factfinder could find them unworthy or credence. Docket no. 42 (citing *Wojciechowski v. Nat'l Oilwell Varco, L.P.*, 763 F. Supp. 2d 832, 859 (S.D. Tex. 2011)

and *Nasti v. CIBA Specialty Chem. Corp.*, 492 F.3d 589, 594 (5th Cir. 2007)). Plaintiff contends that the assertion that Plaintiff was terminated because of a pattern of unsafe acts and failure to follow critical work instructions is untrue because "the decision to terminate was based on only one (1) safety event." Docket no. 42 at 14. Plaintiff also asserts that Defendant has been inconsistent about who the actual decisionmakers were in the termination decision.

In its motion, Defendant asserts that four individuals were "decisionmakers" -- Paul Barham, Fred Bonewell, Lisa Lewis, and Rick Maldonado – and that David Luschen and Lauro Garza were recommenders. However, Plaintiff notes that Defendant's interrogatory response listed all six individuals as "the final decision maker(s) in the decision for Defendant to terminate Plaintiff's employment." Pl. Ex. 35. Defendant's motion further asserts that "the key senior leadership decision-makers met" on February 23, and they were Barham, Bonewell, Lewis, and Maldonado. The motion asserts that "CPS Energy's in-house counsel also attended this meeting to provide legal consultation as necessary" and "the two individuals recommending the type of action to be taken, Luschen and Director of Labor & Employee Relations Garza, attended as well." Docket no. 39-1 at 22.

Plaintiff notes that there is confusing testimony as to Lauro Garza. Plaintiff takes issue with Garza being changed from a decisionmaker to a recommender and contends that Lisa Lewis has provided inconsistent testimony because she testified at her deposition that she did not consider Garza a decisionmaker. However, while Lewis initially did not list Garza as a decisionmaker when asked to list the decisionmakers, she then later recalled that he was present at the February 23 meeting, stating "that's probably why I didn't mention Lauro [when listing the decisionmakers]. I don't consider Lauro as having been a decision-maker." Lewis depo. at 25. When asked why not, she replied, "Lauro's role and that team's role is to make

recommendations. The decision making falls to the business area and the leaders." *Id.* at 25-26. Thus, her testimony is consistent with Defendant's position that Garza was a recommender but not an ultimate decisionmaker. Plaintiff also notes that Bonewell did not include Garza as an attendee, and Garza does not recall a meeting in February 2016. But Plaintiff fails to show how this conflicting evidence create material issues of fact with regard to causation.

Lewis also states in her Declaration that she did not recall during her deposition, but has confirmed since, that Maldonado also participated in the decision. Def. Ex. 11. Plaintiff notes that Bonewell did not list Maldonado as an attendee. But Maldonado's role and any factual disputes about his attendance do not create a material issue of fact. [17]

As to Luschen, he testified that he was aware that he had been identified as a decisionmaker, but explained his role as giving his input "up the chain of command." Luschen depo. at 16, 18. He did not recall attending a meeting with the "C-Suite" decisionmakers. Luschen depo. at 18. But it appears clear that he provided input to those designated by CPS as final decisionmakers, recommending termination, based in part on his discussions with Lujan. He stated, "Me and Mr. Lujan discuss that and then we discuss that with HR and also discuss that with my boss [Maldonado] and he proceeded to discuss a discussion to upper management." Luschen depo. at 19.

Thus, Plaintiff is correct that there is inconsistent testimony about who attended the February 23 meeting and who served as "final" decisionmakers versus who had recommender roles. But these inconsistencies do not ultimately create a material issue of fact or establish a fact

---

[17] The evidence is consistent that Lisa Lewis and Fred Bonewell were at the February 23 meeting and were decisionmakers. No deposition testimony from Paul Barham has been presented. Fred Bonewell testified that, at the meeting, "Mr. Barham supported Mr. Luschen and Mr. Lujan and what had been determined as the principal factors associated with what led to the accident and subsequent injury that Mr. Sanchez sustained, specifically the cutting into the hot cable which should have never occurred and not wearing the personal protective equipment that was afforded to him that would have mitigated, reduced, or have eliminated the possibility of an injury from that flash event." Bonewell depo. at 94.

issue on pretext because they do not tend to establish the falsity of CPS's legitimate, nondiscriminatory reason for discharging Plaintiff. CPS Energy engages in collaborative decisionmaking, and individuals being deposed in 2018 may not recall the specific attendance or roles of individuals at a meeting more than two years before. The Court will presume that each of the six identified individuals played a role as direct recommenders or decisionmakers in CPS Energy's decision to terminate Plaintiff.

Plaintiff also emphasizes the fact that Defendant has cited a "pattern" of safety violations as the basis for his termination, but some alleged decisionmakers stated that the decision was based solely on Plaintiff's behavior in relation to the September 21, 2015 flash event. Plaintiff cites the testimony of Fred Bonewell that (1) only the September 21, 2015 flash event was discussed during the February 23 termination meeting; (2) Plaintiff's corrective action history was not discussed during the meeting; and (3) Plaintiff's safety history was not discussed.

Plaintiff also cites the testimony of Lisa Lewis that (1) she did not recall any other event beside the September 21, 2015 event being discussed during the meeting; (2) she made her decision from conduct that arose from the September 21, 2015 event; (3) Plaintiff's Corrective Action history was not discussed during the meeting and did not play a part in her decision; (4) she did not remember Plaintiff's safety history being discussed; (5) there was no discussion of the Actively Caring plan; (6) there were no documents to review at the meeting; and (7) Plaintiff's performance appraisals were not discussed and she had never seen them. Lewis depo. at 24-30.

In contrast, Luschen testified that his decision that termination was appropriate was based on all of the safety incidents occurring in 2015. Luschen testified that the 2015 events – the unattended burner, the saw/cut incident, and the bucket incident – went into his decision, but not

the March 2014 flash incident. He testified that the September 2015 flash event "was major" and "was a critical event that had the major weight in the decision to terminate." Luschen depo. at 39 Luschen drafted the March 8, 2016 termination letter, which then listed the pattern of poor judgment and unwillingness to follow critical work instructions as the reason for termination. Luschen depo. at 103-104. Lauro Garza testified that all the 2015 safety events and the March 2014 flash event went into his decision, although he felt that "pattern" of events did not start until the second event. Garza depo. at 63, 99, 179.

While it is true that certain decisionmakers testified that only the September 21 incident was discussed and formed the basis for the termination decision, while CPS has taken the position that it was a pattern of incidents, this does not establish the necessary pretext. Again, CPS Energy made a collaborative decision, and thus some of the decisionmakers and recommenders may have focused solely on the September 2015 event, while others may have considered more incidents. In such an instance, CPS's position that it was a pattern of events or behavior is not untrue.

Moreover, Defendant's proffered reason is consistent with Luschen's testimony essentially characterizing the September 21, 2015 incident as the "final straw." In its motion for summary judgment, Defendant notes that Plaintiff was not terminated for the prior violations, although some decisionmakers contemplated it, but "[i]n the final analysis, it was only the September 2015 violation, in combination with Sanchez's safety history preceding his EAP counseling, that led CPS Energy's senior leadership to end his employment." Docket no. 39 at 11. Defendant further asserts, "Certainly, such a serious safety violation would motivate any reasonable employer to terminate employment, especially when the employer considered termination a few months before based on three other safety violations." *Id.* at 11 n.9. Either a

pattern of poor judgment or a serious safety violation, or some combination of both, could be legitimate, nondiscriminatory reasons for termination.

Even if Plaintiff is correct that only the September 21, 2015 incident formed a basis for his termination, he must show that it was not the true reason for his termination, and that discrimination based on his PTSD was a reason. Defendant's witnesses have consistently testified that Plaintiff was terminated for serious safety violations in connection with the September 21, 2015 flash incident, specifically the fact that he cut into the wrong, live cable and was not wearing the proper PPE. Bonewell stated that they came to the conclusion that it was not in the best interest of CPS for Plaintiff to return because of "his behavior that occurred on that event where he marked the cables in a certain manner and then went against his own marking and cut into the hot cable. And further to that, he was not wearing all of his personal protective equipment which he was provided." Bonewell depo. at 85; *see also id.* at 95 (confirming that the factors discussed at the termination meeting were that Plaintiff cut into a live cable and was not wearing the proper PPE, and no other factors were discussed).

Luschen testified, "when an individual goes down and cuts the wrong cable that was clearly marked red and he cut the wrong one without the PPE . . . that is totally unsafe." Luschen depo. at 21. Luschen further stated,

> My understanding is that Mr. Sanchez rushed to the third manhole without his PPE on, without his face shield, without his jacket, Class 3 gloves, went down there and immediately cut the wrong cable. Mr. Rankin had no time to get to the hole. David Breiten, the apprentice, had no time to get to the hole and the trainee helper had not time to get to the manhole. So, yes, I was aware that Lonnie Rankin was not at the top of the hole because of Mr. Sanchez's lack of safety, lack of following the rules, lack of judgment and rushing into the manhole to cut the wrong cable without full PPE resulting in his injury and going to SAMMC.

Luschen depo. at 94.

Plaintiff fails to establish that his safety violations with regard to the September 21, 2015 incident, standing alone, were not a legitimate nondiscriminatory reason for his termination. As noted, CPS Energy policy establishes that a serious safety violation may be the basis for termination. Def. Ex. 10 (Corrective Action Policy) (providing that safety infractions may result in immediate termination). Thus, even a single safety violation could provide a basis for termination under CPS policy. Although Plaintiff takes issue with the assertion that he was not wearing his required PPE, he cannot refute that he cut the wrong cable despite having marked the correct cable himself. Nor does he dispute that he went into the third manhole without waiting for his apprentice or his foreman.

Although Plaintiff has evidence that many of the decisionmakers were aware of Plaintiff's expressed fear and that he had been referred to counseling, and contends that they could infer or actually knew that he had PTSD, this fails to demonstrate that disability discrimination, rather than the legitimate nondiscriminatory reason asserted, played a causal role in the termination decision. All of the decisionmakers and those who had input into the decision testified that PTSD was not discussed at the February 23 meeting. Bonewell expressly testified that PTSD was not discussed. Bonewell depo. at 107. No one testified, and there is no evidence, that their belief or knowledge that he had PTSD or how it might affect his job performance played any role in the termination decision.

The closest Plaintiff comes is this testimony of Fred Bonewell (at 67):

Q. Have you ever heard of PTSD?

A. I did not hear about PTSD until 2017.

Q. What does PTSD stand for?

A. I can't even -- I don't know.

Q. And what did you hear about PTSD in 2017?

A. It was told to me by Mr. Garza what it was in 2017 when the -- we had a collaborative meeting with respect to determining Mr. Sanchez's viability to work at CPS, Mr. Garza explained to me what PTSD is. It's the first time I had heard about that. I did not grow up here. I wasn't necessarily from a military family. But he told me about PTSD at that time frame. That's the first time I became aware of it.

But the fact that Garza may have explained what PTSD is in the context of a discussion "determining Mr. Sanchez's viability to work at CPS" does not mean that anyone considered his PTSD as a causative factor in the termination decision on February 23 or any other time.

Moreover, this testimony was clarified later the in deposition (pages 100-101):

Q. Earlier today I asked you about PTSD and you mentioned a discussion with Lauro Garza in 2017, but then we talked about the year of the termination and so I don't know if you were correcting the year 2017 as when you spoke to Lauro Garza about PTSD and I want to make sure your testimony is clear in the deposition. What is your best recollection of when you had the discussion with Lauro Garza with regard to learning about PTSD?

A. He told me that sometime in 2016.

Q. Was this before or after Gabriel Sanchez's termination that you discussed PTSD with Lauro Garza?

A. I don't remember.

Q. So it's possible it was before Gabriel Sanchez was terminated and it's possible it was after Gabriel Sanchez was terminated that you had this discussion with Lauro Garza about PTSD; is that correct?

A. It could have been either. . . .

Q. Okay. What was the impetus of the discussion with Lauro Garza about PTSD?

A. Lauro was reflecting on his own personal condition.

Q. What do you mean by that?

A. He was explaining to me what it was and that he had it and he was trying to articulate how that has impacted his life.

Q. Do you know how that topic of discussion came up between you and him?

A. No.

Q. Was anyone else present when you had this conversation about PTSD with Mr. Garza?

A. It was he and I.

Thus, this further discussion makes clear that they were not discussing PTSD at the February 23 meeting at which the termination decision was made, and that they were not even discussing Plaintiff's PTSD, but Garza's PTSD. Garza testified that he was not even aware that Plaintiff had been diagnosed with PTSD until he was preparing for his deposition. Garza depo. at 86. Thus, the evidence does not support an inference that Plaintiff's PTSD was discussed as a basis for Plaintiff's continued employment viability.

Plaintiff faults CPS for not interviewing him or getting his side of the story and takes issue with the investigation into his allegations of teasing and harassment as the cause of his behavior on September 21, but a deficient investigation or an investigation that reaches an erroneous conclusion does not establish discriminatory motive. *Medlock v. Ace Cash Exp. Inc.*, 589 F. App'x 707, 710 (5th Cir. 2014); *Bryant v. Compass Group USA Inc.*, 413 F.3d 471, 478 (5th Cir. 2005) ("While the prudent action may have been to discuss the event with [plaintiff] and obtain his side of the story before terminating him, evidence that the employer's investigation merely came to an incorrect conclusion dos not establish a [discriminatory] motivation behind an adverse employment decision."). Even an incorrect belief that an employee's performance is inadequate constitutes a legitimate, non-discriminatory reason for termination. *Little v. Republic Ref'g Co.*, 924 F.2d 93, 97 (5th Cir. 1991). Further, even if Plaintiff is correct that the alleged teasing constitutes prohibited harassment under CPS's anti-harassment policy and thus should have been reported to HR and investigated by HR, Lujan and

Luschen's alleged failure to comply with the reporting requirement still fails to establish pretext or that disability discrimination played a causal role in his termination. Regardless of the asserted reason for his behavior, Plaintiff engaged in unsafe conduct causing significant injury, and that conduct was the basis for his termination. None of the alleged departures from CPS policies undermine the asserted basis for termination, establish pretext, or establish disability discrimination as a causative factor.[18]

In sum, CPS Energy offered a legitimate, nondiscriminatory reason for terminating Plaintiff. Plaintiff offered a variety of evidence attempting to show that the reason is unworthy of credence, but it does not suffice. Even if Plaintiff was teased and even if the decisionmakers were aware that he had PTSD or believed that he had it, a reasonable factfinder could not infer from the evidence that CPS's proffered motivation is not true and that it discriminated against Plaintiff based on actual or perceived disability.

## Conclusion

Defendant CPS Energy's Motion for Summary Judgment (docket no. 39) is GRANTED. Plaintiff has failed to raise a material fact issue as to whether he was qualified at the time of his termination and has failed to raise a material fact issue on pretext/causation.

The Clerk shall enter Judgment pursuant to Rule 58 that Plaintiff shall take nothing by his claims and that his claims are dismissed with prejudice.

---

[18] A mere alleged failure to follow internal policies is insufficient on its own to show pretext. Plaintiff must also point to evidence that he was treated differently than similarly situated employees or show a nexus between the procedural departure and his disability. *See Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 346 (5th Cir. 2007) ("A defendant's failure to follow its own policy is not probative of discriminatory animus in absence of proof that the plaintiff was treated differently than other non-minority employees because Title VII does not protect employees from the arbitrary employment practices of their employer, only their discriminatory impact.") (quotation marks omitted); *see also Powers v. Dallas Cty. Cmty. Coll. Dist.*, No. CA3:96-1087-BC, 1997 WL 446442, at *7 (N.D. Tex. Jul. 16, 1997) ("an employer's failure to follow it's [sic] own procedures does not conclusively establish pretext absent some kind of nexus between the employment action and the employee's [protected category]").

Defendant may file a bill of costs pursuant to the Local Rules.

Docket numbers 31 and 32 are DISMISSED AS MOOT.

SIGNED this 17th day of May, 2019.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE